IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 27, 2024 Session

## HOWARD HAWK WILLIS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Washington County**
**No. 42660     Thomas J. Wright, Senior Judge**

_____

### No. E2023-01540-CCA-R3-PD

_____

In 2010, a Washington County jury found Petitioner, Howard Hawk Willis, guilty of two counts of premeditated first degree murder and one count of felony murder in the perpetration of a kidnapping. The jury sentenced Petitioner to death on each conviction.[1] After his convictions and sentences were affirmed by the Tennessee Supreme Court on direct appeal, Petitioner sought post-conviction relief. The post-conviction court denied relief after extensive hearings. On appeal, Petitioner raises numerous arguments assailing his convictions and sentences based primarily on ineffective assistance of counsel as well as several stand-alone claims. After a thorough review of the record, the applicable law, the parties' briefs, and oral arguments, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which KYLE A. HIXSON and MATTHEW J. WILSON, JJ., joined.

Joshua D. Hedrick and Cullen M. Wojcik, Knoxville, Tennessee, for the appellant, Howard Hawk Willis.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen Pro Tempore, District Attorney General; and Leland L. Price, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The trial court merged the felony murder conviction into one of the convictions for premeditated first degree murder.

# OPINION

## I. Factual and Procedural Background

This appeal arises from the 2002 murders of a young married couple, Adam and Samantha Chrismer. Following an investigation, Petitioner was charged in connection with their murders, as well as the accompanying dismemberment of one of the victims.

### *Pretrial Proceedings*

After multiple changes in counsel that resulted in long delays in the proceedings, the trial court ruled that Petitioner had forfeited and/or waived his right to counsel, requiring Petitioner to represent himself with the assistance of elbow counsel. Petitioner challenged the decision on interlocutory appeal. This court set out the following summary of facts regarding the issues between Petitioner and the various attorneys appointed to represent him, as follows:

> The trial court initially appointed two lawyers[, James Bowman and Stacy Street,] to represent the indigent [Petitioner]. [Counsel Bowman] had practiced for 36 years and had handled approximately 20 capital cases. None of his clients had been placed on "death row." In [Petitioner's] case, counsel filed numerous and extensive motions supported by legal memoranda. The motions included a motion to suppress upon which the trial court conducted a lengthy evidentiary hearing.

### *First change of counsel*

> With the trial scheduled for April 11, 2005, [Petitioner], acting pro se, moved the court on March 14, 2005, to discharge his counsel and to appoint new counsel. On the same day, both attorneys moved to withdraw, alleging that the "attorney client relationship has deteriorated to such an extent that the attorneys should be permitted to withdraw" and that they had "encountered constant difficulty in obtaining the cooperation of [Petitioner] in the preparation of the defense." Counsel further alleged:
>
> > [Petitioner] has consistently refused to cooperate in providing requested information. He has insisted that the attorneys pursue factual investigations unrelated to this case; . . . that they file unrelated lawsuits against individuals involved in this case. [Petitioner] has insisted that the attorneys obtain evidence for him to review and then refused to review the

evidence. He had demanded that he receive medical treatment and then refused to accept the treatment when it was provided. He has instructed defense investigators to conduct investigations not specifically authorized by the attorneys and to withhold information from the attorneys. He has accused some associated with the defense investigation of working for the State. His conduct in regard to the efforts of the attorneys to prepare this case can be best described as "stone-walling."

On March 15, 2005, the trial court conducted an extensive hearing in which it reviewed each of the 55 complaints [Petitioner] had leveled against his attorneys. The court expressed concern that lead counsel and co-counsel had worked on the case for one and one-half years. The court, after reviewing [Petitioner's] complaints one by one, found them to be baseless and denied [Petitioner's] motion to discharge counsel. At one point in the dialogue with [Petitioner], the trial judge remarked that ultimately [Petitioner] may be "representing [himself] in this." The judge opined that [Petitioner] had shown that he was "virtually impossible to communicate with."

On March 18, the court conducted further hearing on counsels' motions to withdraw. The judge stated that both [Counsel Bowman] and [Counsel Street] were very experienced, effective lawyers and indicated that "the whole problem [was] caused by [Petitioner]." The judge further commented,

> [I]t appears to the court that what he is doing—he's manipulative. He's looking—he's come within less than a month of a trial date, and he wanted things reheard [on the motion to suppress] he couldn't get heard. He managed to do that through the back door . . . . But, he is coming close to forfeiting his right to counsel. This court is not going to continue appointing counsel forever . . . . [T]he court finds in this case that [Petitioner] has unreasonably requested counsel to withdraw. At this point I don't think the court has any option but to allow [counsels'] motion to be relieved as counsel.

> . . . .

> [If] I were the parent of . . . either of [the victims], . . . I would think the system is absolutely crazy; that—that somebody in [Petitioner's] shoes can manipulate the system;

- 3 -

can refuse to acknowledge what the law is; refuse to assist counsel; refuse to answer questions; refuse to look at evidence; and refuse to acknowledge the controlling authority in the law and—result in—in manipulation of the system and his case being continued because of new lawyers. The problem with the situation is that the court finds that [counsel] just cannot under the requirements of the ethics of the profession represent him, even though, it is entirely his fault.

Thus, the trial court granted counsels' motion to withdraw and appointed the First District Public Defender to represent [Petitioner]. The trial court then had [Petitioner] sworn and asked him, "[D]o you understand that—that if you cause the conflict with your next set of lawyers that you may very well [be] representing yourself?" [Petitioner] responded, "I do." The court then addressed a series of questions to [Petitioner] as a means of assuring that he understood the implications of defending a capital murder case without representation of counsel.

The trial court canceled the April 11, 2005 trial setting.

*Second change of counsel*

On April 4, 2005, the First District Public Defender moved to withdraw, citing conflicts of interests among members of [Petitioner's] family and assistant public defenders. On April 5, 2005, the trial court granted this motion and appointed the Second District Public Defender to represent [Petitioner].

*Third change of counsel*

On the same day, April 5, 2005, the Second District Public Defender moved the court to vacate the appointment order on the grounds that the trial court was not authorized to appoint "a district public defender outside of their specific district." The trial court agreed and appointed new lawyers to represent [Petitioner].

*Fourth change of counsel*

On May 25, 2005, the newly appointed attorney moved to withdraw on the basis of serious illness in his immediate family. On May 31, 2005,

- 4 -

the trial court granted the motion and appointed two other lawyers[, William Lawson and Gene Scott,] to serve as new counsel.

In August 2005, the trial court reset the trial for January 30, 2006.

*Fifth change of counsel*

On September 28, 2005, [Counsel Lawson] moved to withdraw from the case on the ground that a conflict of interests had emerged when [Petitioner] filed a complaint against counsel with the Board of Professional Responsibility ("BPR"). The court conducted a hearing on November 7, 2005. [Counsel Lawson], who had practiced law for 21 years, stated that [Petitioner] had claimed in a complaint to the BPR that counsel had not read the discovery materials in the case. Counsel characterized [Petitioner] as "a blatant prevaricator" and added, "This is the type of behavior that [Petitioner] persists in. You try to get information out of him you can't get information out of him." [Counsel Scott] stated that the filing of the complaint with the BPR had brought the case to a "standstill." The trial judge commented, "[I]t appears that [Petitioner] is manipulating the system, but, it still doesn't leave the court any—any choice, at least, at this point. The motion to withdraw is granted."

The court then admonished [Petitioner] that if he "create[d] another conflict then [he was] going to be representing [himself]." In its order granting the withdrawal motion, the trial court stated that "the attorney/client relationship between lead counsel . . . and [Petitioner] . . . has deteriorated to the point where lead counsel's zealous representation of [Petitioner] is extremely difficult if not impossible." The court appointed new lead counsel[, Woody Smith]. [Counsel Smith and Counsel Scott] then . . . filed an extensive, supplemental battery of motions.

The trial remained scheduled for January 30, 2006, but at some point, the trial court reset the trial for September 19, 2006.

*Sixth change of counsel*

On August 8, 2006, [Counsel Smith] moved to withdraw citing "irreconcilable conflict"; however, counsel apparently agreed to withdraw the motion in consideration of [Petitioner's] dismissing a "complaint" he had filed against counsel. The trial court ordered a mental health evaluation of [Petitioner] and continued the trial until October 24, 2006.

On October 9, 2006, the mental health evaluators in Kingsport filed with the trial court a letter in which they reported that they were "unable to properly evaluate [Petitioner, who] did not cooperate with the evaluation process as he insisted on speaking to his attorney prior to the assessments." The evaluators expressed "no confidence that rescheduling this evaluation would yield a different outcome." On October 13, 2006, the trial court ordered that [Petitioner] be sent to Middle Tennessee Mental Health Institute in Nashville (MTMHI). The October trial date was continued. In November and December 2006, MTMHI reported to the trial court that [Petitioner] "is capable of adequately assisting in his defense in a court of law . . . [,] that he does understand the charge pending [against] him . . . [,] and [that he] is able to advise counsel and participate in his own defense." MTMHI noted that [Petitioner] "was not willing to participate in some of the evaluation processes" although the "evaluation staff did have a great deal of observational data during the inpatient assessment." Essentially, MTMHI concluded that a defense of legal insanity was not supportable, that [Petitioner] evinced no evidence of organic brain damage, and that he was of average intelligence.

In March 2007, the trial court set the case for trial on October 29, 2007.

*Seventh change of counsel*

On March 19, 2007, both [Counsel Smith and Counsel Scott] moved to withdraw from the case, citing "irreconcilable conflicts" and [Petitioner's] filing a complaint against both attorneys with the BPR. [Petitioner] also moved the trial court to discharge his lawyers.

In the March 19, 2007 hearing, the trial court urged [Petitioner] to have "a prayer meeting" with his attorneys. The judge directed comments to [Petitioner]:

> I'm not going to go on appointing one lawyer, after another lawyer, after another lawyer. If I find that you're the one causing the conflict then you're stuck, and you're much more likely to get the death penalty if you try to represent yourself. It is an extremely stupid thing to do. But, we've been through the law on this before. If the court finds that appointment of additional counsel is futile then that's where you are.

- 6 -

At this point, the court declined to rule on counsels' motion to withdraw and [Petitioner's] motion to discharge counsel.

On October 8, 2007, both [Counsel Smith and Counsel Scott] filed motions to withdraw indicating that [Petitioner] had "fired" the attorneys and had, on October 4, "refused to speak with counsel [or] co-counsel." The record reflects no immediate ruling on these motions.

Although the trial began on October 29, 2007, the proceedings were suspended during jury selection when the jury pool was depleted.

On February 7, 2008, [Petitioner] filed a motion to have his lawyers removed. On April 16, 2008, [Counsel Smith] moved to withdraw alleging that "the relationship between [Petitioner] and [c]ounsel has deteriorated to such a degree that [counsel] can no longer act as a zealous advocate."

The trial court conducted a hearing on April 17, 2008. [Petitioner] informed the court that he had "mailed out" lawsuits against both [Counsel Smith and Counsel Scott] to the United States District Court in Greeneville. [Petitioner] said, "And since this is filed I really don't think there's much controversy. I don't think they can continue—continue under any circumstances."

[Petitioner] was then sworn and testified that his lawyers were ineffective because they failed to file motions for "search warrants [and] for expert witnesses" and that they had failed to "file[ ] for various other investigative things to be done." [Petitioner] called witnesses, including co-counsel on the case, to try to impugn the affidavit supporting a search warrant. This effort, aimed at showing counsels' ineffectiveness, was, in a word, ineffectual.

[Counsel Smith] explained that pursuing the motion to suppress sought by [Petitioner] would have been "a terrible mistake" because it tied him "to a potential crime scene. We felt that—that the more we distanced him from that, that would be the better strategy." Counsel explained, however, that [Petitioner] had ceased talking to counsel about issues in the case.

Addressing counsels' motions to withdraw, the trial court agreed that [Petitioner's] filings against his attorneys both with the BPR and in the federal district court posed conflicts for counsels' continued representation

- 7 -

of [Petitioner]. The trial court granted counsels' motions to withdraw and held that [Petitioner] had forfeited his right to counsel. The court stated,

> So, it appears he's waived his right to counsel because he's persistently demanding counsel of his choice and he refuses to cooperate. He refuses to talk to you all, refuses to communicate. He has refused to talk to the experts [for] evaluation, and—this is quite serious. [Denying the appointment of further counsel] should be done only when it gets to the point that appointing additional counsel would be futile. . . . [H]e knows how to put [the case] off again. He knows to file a complaint to the Board of Professional Responsibility about his lawyers, and he knows he can sue his lawyers. But, he—he hasn't shown the court that [the lawyers] have even begun to do anything other than what was in his best interest. So, the conclusion the court reaches . . . is that [Petitioner has] egregiously manipulated the constitutional right to counsel resulting in delay, disruption and it's prevented the orderly administration of justice.

*State v. Willis*, 301 S.W.3d 644, 646-49 (Tenn. Crim. App. 2009). This court affirmed the trial court's determination that Petitioner had forfeited and/or waived his right to counsel, and the Tennessee Supreme Court denied further review. *Id.* at 644-45.[2] When the case went to trial in 2010, Petitioner represented himself with the assistance of elbow counsel.

### *Trial Testimony*

The following is a summary of the evidence presented at Petitioner's trial, as found in the direct appeal opinion from the Tennessee Supreme Court:

### *1. State's Proof*

> The trial was held in June 2010, and the following evidence came before the jury. Victims Adam and Samantha married in August 2002. Sometime earlier that year, they struck up a friendship with [Petitioner's] daughter, Kelly Willis . . . . Through Kelly, Adam and Samantha became acquainted with [Petitioner]. Various witnesses testified that they saw the victims at the Johnson City home of [Petitioner's] mother, Betty Willis . . .

---

[2] On remand, the trial judge, Judge Lynn W. Brown, recused himself from the case, and Judge Jon Kerry Blackwood was designated as the trial judge.

on various occasions between April 2002 and September 2002. Photos taken in an August 2002 photo session at a Chattanooga, Tennessee Olan Mills Photography studio depicted the victims with each other and with [Petitioner].

Vickie Rhyne was a veterinarian with the East Ridge Animal Hospital in Chattanooga. She testified that, on September 25, 2002, a pet dog named "Doge" was checked in for boarding. Samantha Chrismer was listed as the owner of "Doge," and [Petitioner] was listed on the check-in form as an emergency contact. No one ever came to pick up the dog. Dr. Rhyne did not know whether anyone ever tried to contact [Petitioner] as the emergency contact. At some point, she learned that the owner was deceased. Eventually, in January or February 2003, Dr. Rhyne took the dog home to live with her.

Johnson City attorney James Robert Miller testified that he and his secretary went to Betty's house at 104 Brentwood Drive, in Johnson City, during the lunch hour on September 27, 2002, to handle a routine business matter. When he drove up, he saw [Petitioner] standing outside. When he went inside, the kitchen, bathroom and living room areas of the house were "covered in a lot of debris." He saw two teenagers—a male and a female—inside the home playing video games on the television. Mr. Miller chatted with the teenage girl. She told him that she met [Petitioner] at a Hardee's restaurant "a week or two before," and came up from Georgia to clean the house. Later, while he was still at Betty's house, Mr. Miller observed the teenage girl in the back yard with [Petitioner]. She spoke on a cell phone and then handed it to [Petitioner], who spoke on the same phone and then handed it back to her.

Wilma Clay was Betty Willis's next-door neighbor. Ms. Clay testified that, on various occasions between April and September 2002, she observed [Petitioner], his daughter, Kelly, a young girl and a young man at Betty's house. She did not see the teenagers after September 2002. In the early morning hours of Saturday, October 5, 2002, Ms. Clay went outside her home to smoke a cigarette and saw [Petitioner], also smoking a cigarette, standing outside next to Betty's red Jeep. The Jeep appeared to be filled with personal belongings. When [Petitioner] finished smoking his cigarette, he threw it on the ground, picked up a black plastic bag from the back of the Jeep, and threw it on the ground. The neighbor finished her own cigarette and re-entered her house. Sometime later, she came back out to get the newspaper and noticed that Betty's garage door was down but there was a

light on inside the garage. She did not think that the garage light was on the first time she went outside.

At the time of the events in question, Samantha's mother, Patty Leming, lived in Chattanooga, Tennessee. She had five children, including sons, Daniel Foster and Richard Foster, and the victim, Samantha. [Petitioner's] daughter, Kelly, initially befriended Daniel and Richard, and later befriended Samantha. Ms. Leming testified that, at one point prior to their disappearance, the victims were living with Kelly in [Petitioner's] Rossville, Georgia trailer. Ms. Leming assumed that [Petitioner] was living there as well. During that period, she saw Samantha weekly because [Petitioner] brought Samantha by her house to visit. Approximately one week before the victims disappeared, they moved into their own trailer, also in Rossville, Georgia.

Ms. Leming last saw the victims on October 4, 2002, at a Chattanooga Pizza Hut. She and Samantha were waiting for a pizza when Adam arrived and said to Samantha, "Howard said [ ] let's go." The victims left in a red Jeep that Ms. Leming thought belonged to [Petitioner]. Ms. Leming said it appeared to her that [Petitioner] was driving the vehicle. After that, all of Ms. Leming's attempts to reach Samantha were fruitless.

Adam's mother, Teresa Chrismer, lived on Lookout Mountain, Georgia. Adam was the youngest of her four children. Ms. Chrismer testified that when Adam met Samantha, he moved out of her house. At some point during 2002, Ms. Chrismer became acquainted with [Petitioner] because he brought Adam and Samantha to her house to visit. The last time she talked to Adam was on October 4, 2002. Adam called her, upset and crying, and told her that he wanted to come home. Although Adam made a practice of calling her every two or three days, after October 4, all her attempts to reach him were fruitless. She called the contact number Adam had given her and when there was no answer, she left a voice message for him.

On or about October 7 or 8, 2002, Ms. Chrismer received a call from a Bradley County detective who was looking for Adam. The call prompted her to file a missing persons report on Adam. Subsequently, on the evening of October 11, 2002, Ms. Chrismer received a call from [Petitioner]. Caller I.D. indicated that [Petitioner] was using the same phone on which she earlier left the message for Adam. When she asked [Petitioner] if he knew where Adam was, he told her the last time he had seen Adam was at the Rossville,

- 10 -

Georgia trailer. While Ms. Chrismer was on the telephone with [Petitioner], she directed her husband to go to a neighbor's house to call the Walker County, Georgia Sheriff's office and inform them of the contact. During her conversation with [Petitioner], Ms. Chrismer could hear two women talking in the background; [Petitioner] was trying to get them to "shut up." She described his demeanor on the telephone as "cool as a cucumber." On approximately October 13, 2002, someone from an East Tennessee law enforcement agency contacted Ms. Chrismer and asked her for a description of any unique physical features of Adam's head or face. Her husband told them that Adam had a BB imbedded in his cheek from a prior injury.

Patrol Officer Bill Burtt testified that, in October 2002, he was the Captain of the criminal investigations division for the Bradley County, Tennessee Sheriff's Department. [Petitioner] was scheduled to come in for an interview on October 4, 2002, on another matter, but he called one of Officer Burtt's co-workers, Detective Shaunda Efaw, and told her he could not come in that day. On October 8, 2002, [Petitioner] came in and they interviewed him at that time. During the course of that interview, they asked [Petitioner] if he knew the whereabouts of the victims. He indicated that he had last seen them on October 4, 2002, and he thought they were possibly in Georgia. Officer Burtt sent detectives into Georgia to try to find the victims, and spoke that day to Adam's mother on the phone. He believed that Adam's mother filed a missing persons report after he spoke to her. On October 11, 2002, Officer Burtt and two other Bradley County officers went to Johnson City, Tennessee, and served an unrelated arrest warrant on [Petitioner]. By this time, they suspected that [Petitioner] was involved in the disappearance of Adam and Samantha. At the time of his arrest, [Petitioner] was at the home of his Aunt Marie, at 1324 Lowell Street, which was around the corner and behind his mother Betty's house. Both a blue Jeep and a red Jeep were parked at Aunt Marie's residence at that time. The red Jeep was towed to Bradley County. Detective Shaunda Efaw, also of the Bradley County Sheriff's Department, testified that [Petitioner] was supposed to meet with her on October 4, 2002, but did not show up that day. He came in on October 8, 2002, however, and she interviewed him at that time. When questioned as to the whereabouts of the victims, [Petitioner] said that he had not seen them since he saw them in North Georgia on about October 4th. He indicated that his ex-wife, Wilda Willis . . . , might better recall the date.

On October 10, 2002, Detective Efaw received from [Petitioner] a message asking her to call him. When she did, he reiterated that the last time he saw the victims was at their Mohawk Road trailer in Rossville, Georgia.

On October 11, 2002, Detective Efaw was in Washington County, Tennessee, searching for the victims. She was present when [Petitioner] was arrested on a federal warrant at the home of his Aunt Marie. Detective Efaw also recalled that both a blue Jeep and a red Jeep were parked at Aunt Marie's house at the time, and that one of them was towed from the scene at the direction of her Bradley County supervisors. She believed that the red Jeep was the vehicle that was towed because [Petitioner's] ex-wife Wilda had reported that she saw [Petitioner] in a red Jeep on October 4th.

Detective Efaw testified that Wilda came to the Washington County Sheriff's Office at about 9:00 p.m. on the evening of [Petitioner's] arrest. She told them that she intended to go to [Petitioner's] federal court hearing in Greeneville, Tennessee, the next day. Detective Efaw asked Wilda to record her telephone calls with [Petitioner]. Wilda agreed, and Detective Efaw gave Wilda a tape recorder for that purpose. After that, Wilda periodically brought back completed recordings of those conversations. In January 2003, Detective Efaw went with Wilda to look for a chainsaw off I-75 in Bradley County and to look for a gun at another location.

On October 11, 2002, fisherman Luther Earl Whitson saw what he believed was a mask floating in Boone Lake, near a boat ramp at Winged Deer Park in Washington County, Tennessee. It turned out to be a severed human head. Mr. Whitson called 911. Over [Petitioner's] objection to its gruesome nature, the trial court permitted the State to introduce into evidence a color photograph of the severed head.

The next day, on October 12, 2002, fisherman Edward Brownlow Baker was participating in a fishing tournament on Boone Lake. He saw a severed human hand floating in the lake and called 911. Mr. Baker retrieved the hand with a fishing net and carried it to shore near a bridge, where he met investigating officers. Over [Petitioner's] objection, the trial court permitted the State to introduce into evidence a color photograph of the severed hand.

Later that day, Jerry Taylor, a bus driver for the Washington County Sheriff's Department's community service program, brought a crew of inmates to walk the bank of Boone Lake near the Devault Bridge. Within fifteen to twenty minutes, they found another severed human hand. Over [Petitioner's] objection, the trial court permitted the State to introduce into evidence a color photograph of the second severed hand.

At some point during this same period, Isaac Nichols was fishing with his daughter and his nephew on the banks of Boone Lake. Mr. Nichols' daughter found a piece of human skull that measured approximately five inches in diameter. Mr. Nichols called 911 and turned the skull fragment over to the police.

Dwayne Cowan was the booking officer at the Washington County Jail when [Petitioner] was brought in on the federal warrant on October 12, 2002. He testified that, when booking a person, the booking officer collects all personal effects and secures them, fingerprints the inmate, then assigns the inmate a classification status. Mr. Cowan identified the property receipt for the items collected from [Petitioner] on October 12, 2002. Included on the list of items was a pair of white tennis shoes.

After [Petitioner's] arrest, police monitored and recorded a series of telephone calls from the jail between [Petitioner] and his mother. In one of the calls, when Betty referred to a "storage unit," [Petitioner] quickly told her to "shut up." After hearing that exchange, police began contacting self-storage facilities in the area. They learned that, on October 10, 2002, Betty had rented Unit X47 at the 24-Hour Self Storage facility in Johnson City, Tennessee. Catherine Campbell was the manager of that storage facility. Ms. Campbell testified that, on October 10, 2002, a "middle aged to older" man called to inquire about renting a unit for his mother. When Ms. Campbell told the caller that she would have to speak to his mother directly, a female came onto the phone and identified herself as Betty Willis. Ms. Campbell instructed the woman to fill out an application and leave it, along with a payment of fifty-five dollars, in a lockbox that was on the property for that purpose. Later that evening, Ms. Campbell went by the facility and picked up the completed paperwork and a check. Ms. Campbell identified the contract, completed in the name of "Betty H. Willis" with a reported address of 104 Brentwood Drive, in Johnson City, Tennessee. Ms. Campbell also identified a check submitted on Betty's bank account as payment. The contract listed Betty's sister, Marie Holmes, as the emergency contact. The bank returned the check four days later for "non-sufficient funds." Ms. Campbell explained that the entry code for the gate to the facility was the last four digits of the lessee's social security number. On cross-examination, she conceded that there was no video surveillance, so there was no way to know for certain who entered onto the property through the gate.

Dr. Larry Miller, a forensic document examiner for the Department of Criminal Justice at East Tennessee State University, was accepted as an

- 13 -

expert in handwriting analysis. He examined the rental contract for the 24-Hour Self Storage facility and the check written to the facility, both purportedly signed by Betty Willis, and compared these documents to a known handwriting sample from Betty. Dr. Miller opined that the signature on both the contract and the check was written by Betty.

When law enforcement officers learned about the rented storage unit, police officers went to the unit and found it padlocked. However, the smell of decay was apparent, and officers observed maggot activity at the crack where the door met the concrete. Based on the facts known at that point, police officers contacted the Tennessee Bureau of Investigation (TBI). They secured the storage unit by parking two patrol cars at the scene overnight and obtained a search warrant for the unit. They also obtained search warrants for Betty Willis's house at 104 Brentwood Drive in Johnson City, Tennessee, and Marie Holmes' house at 1324 Lowell Street in Johnson City, Tennessee. Inside the storage unit, officers found two beige 50-gallon Rubbermaid storage containers covered with a blue tarp. Underneath the blue tarp, on top of the containers, they found a hammer, a hatchet, and a pair of scissors. The Rubbermaid containers were tied with yellow nylon rope. On top of the containers, there was a plastic bag containing five pop-top style air freshener cans. Beside the containers on the floor were two large plastic fuel cans containing kerosene. TBI forensic investigators collected fingerprint samples from several objects in the unit, including the blue tarp that covered the containers. A fingerprint taken from the tarp was later matched to [Petitioner's] right thumb.

When officers looked inside the storage containers, they found two human bodies. There was a female body in one container, and a male body in the other, minus head and hands. Both bodies were covered with layers of fabric, blankets and pieces of carpet. The male body was also covered with a black coat that had a distinctive red plaid flannel lining. Inside the container with the female body, there were live fly larvae but no pupae. Inside the container with the male body, there were only pupae. Samples of the larvae and pupae were collected from each container at the direction and guidance of entomologist Dr. Erin Watson-Horzelski. The samples were later sent to Dr. Watson-Horzelski for examination.

Washington County Sheriff's Department Investigator Todd Davis was present during the search of the storage unit when the Rubbermaid containers with the victims' bodies were found. He later investigated local retailers who sold this type of container. Investigator Davis found and

- 14 -

purchased an identical container at the Johnson City Walmart near Interstate Highway 26.

Joshua Hopkins worked in store loss prevention at the Johnson City Walmart where Investigator Davis purchased the Rubbermaid storage tote. At the request of the Washington County Sheriff's Office, he researched the sales history at that store for that particular storage container. Store records reflected that, on October 7, 2002, at 10:29 a.m., someone purchased six (6) "pop-top" style cans of air freshener of the same type found in the storage unit. Later that day, at 3:51 p.m., someone purchased one 50-gallon Rubbermaid container, a hatchet, and a particular brand of tennis shoes. The tennis shoes were the same brand as those worn by [Petitioner] on the day of his arrest. Mr. Hopkins could not say who purchased the items and conceded that other Walmart stores could have sold the same items.

The bodies were transported inside the storage containers to forensic pathologist Dr. Mona Stephens . . . to be autopsied. The severed head and hands recovered at Boone Lake were also sent to Dr. Stephens. Fingerprint analysis performed on the female body matched Samantha. Fingerprints taken from the severed hands matched Adam. The description given by Adam's father of the physical features of Adam's head—particularly a BB shell in his cheek from a prior injury—was determined by the medical examiner to be consistent with the human head found floating in Boone Lake. Later DNA analysis of the male body inside the container confirmed that it was Adam.

Dr. Stephens testified that, inside the container with Samantha's body, there were fly larvae but no pupae casings. Samples were collected and refrigerated until they could be sent to FBI Agent Rainer Drolshagen. The container in which Samantha's body was found contained layers comprised of a pillow inside a pillowcase, two small rugs, and then Samantha's body. The body was nude, and there was a gag around Samantha's mouth. Each of her hands was bound with a plastic zip tie, looped together behind her and then bound with a third zip tie. Each of her ankles was bound with a plastic zip tie as well, but those zip ties were not bound together. Discoloration of Samantha's extremities indicated that she was alive when she was bound. She sustained bruises to her right leg, to the inside of her right breast, to her right shoulder, and to her feet. The fatal wounds to Samantha were two gunshot wounds to her head. Dr. Stephens found one (1) bullet in four (4) fragments in Samantha's neck. Drug screens revealed benzodiazepine in Samantha's gastric contents and in her liver.

Dr. Stephens testified that when she opened the container with Adam's body, she found fly pupae, but no larvae. As she had done with the container in which Samantha's body was found, Dr. Stephens collected samples and refrigerated them until they could be sent to F.B.I. Agent Drolshagen. The container in which Adam was found was layered with two throw rugs, a size XXL black jacket, and then Adam's body. The body was wrapped first in a blue comforter with sunflowers on it, and then a pink fleece blanket, all tied up with black nylon rope. The black jacket had damage consistent with having been cut through with a chainsaw. Fibers imbedded in the body, as well as bone fragments and tissue in the materials, suggested that the body was wrapped when it was dismembered. Once unwrapped, Adam's body, minus his head and hands, was observed to be dressed in flannel boxer briefs and cargo shorts. His legs were cut through the bones, but the connective tissue remained intact. The legs of the shorts displayed chainsaw marks, and cuts on Adam's legs were consistent with those chainsaw marks. It appeared that Adam's legs were cut in order to fold his body into the Rubbermaid container. The absence of arterial blood indicated that Adam was already dead when his body was dismembered.

Dr. Stephens testified that imbedded in Adam's severed head was the same type of polyester batting material as was found wrapped around his body in the container. The head revealed a bullet entry wound beneath the chin, which traveled up through the pharynx and out through the base of the skull. Stippling around the entry wound suggested that the shot was fired within two feet of the wound. Bruising around the wound indicated that Adam was alive when it was inflicted. A piece of front left parietal skull, retrieved from the vicinity where the severed head and severed hands were found, fit with the calvarial bone of Adam's head and had fractures and separations along the cranial suture lines that were consistent with a saw mark.

Dr. Stephens testified that, because she had been present during the search of the storage unit and had unpacked the storage containers during the autopsies, she also participated in the search of the residence at 104 Brentwood Drive, to look for items in the home that might match items found in the storage unit or inside the containers. When she entered the house, Dr. Stephens said, it was in "major disarray." During the search, officers found in a bedroom dresser drawer a pillowcase identical to the pillowcase that was on the pillow inside the container with Samantha's body.

- 16 -

Dr. Linda Littlejohn, a forensic scientist in the microanalysis section at the TBI, testified for the State as an expert on microanalysis. She received several items of evidence to analyze in the case. Dr. Littlejohn compared "a piece of jacket from [a] body in [a] container," with a piece of fabric found on the garage floor during the search of Betty's property. Microscopic examination revealed the two fabrics to be of common origin. Dr. Littlejohn also examined debris recovered from a chainsaw. She noted numerous pieces of fabric and fiber bundles on the chain. When she compared that debris to the piece of jacket she received from Dr. Stephens, she found that they were microscopically consistent and concluded they had a common origin. Dr. Littlejohn also examined two pieces of carpet—one found inside a container and one from 104 Brentwood Drive in Johnson City. The carpet fibers were consistent and could have had a common origin. Finally, Dr. Littlejohn compared shoe prints found on the tarp that covered the two storage containers, and partial shoe prints found on the floor of the 24-Hour Self Storage unit, with shoes belonging to both Betty and [Petitioner]. None of the shoe prints were consistent with either pair of shoes.

In October 2002, FBI Agent Drolshagen was stationed in Johnson City, Tennessee. He participated in several aspects of the investigation in this case. He was present during the autopsy of Samantha. He assisted in executing the search warrant at 104 Brentwood Drive by participating in and videotaping the search. He also collected evidence for testing from the 24-Hour Self Storage unit. Specifically, under the guidance and direction of entomologist Dr. Watson-Horzelski, Agent Drolshagen collected and stored insect evidence. Per Dr. Watson-Horzelski's instructions, he stored the insect samples two ways: some in alcohol to preserve the state in which they were found, and some in ground beef to preserve them as live samples. Those samples were sent to the TBI forensic services laboratory until they could be examined by Dr. Watson-Horzelski. Agent Drolshagen testified that it was very cool inside the storage unit on the day in October 2002 on which they executed the search warrant. Later, in January 2003, at the direction of Dr. Watson-Horzelski, Agent Drolshagen returned to the storage unit and collected daily samples of high and low temperatures inside the unit for four consecutive days, on January 9, 10, 11 and 12, 2003. To collect those temperatures, Agent Drolshagen used a thermometer that recorded both temperature and humidity. He placed the thermometer on the floor in the vicinity where the Rubbermaid storage bins had been sitting, and checked the readings every twenty-four hours over the course of those four days. Agent Drolshagen also obtained from the National Oceanic and Atmospheric

Association (NOAA), a chart depicting the high and low temperatures for that geographic area during the month of October 2002.

Dr. Watson-Horzelski testified for the State as an expert in entomology and estimation of time of death. Her focus was on the association of insects—primarily flies and beetles—with decaying animal material, and the examination of the insect development to estimate time of death. To place her findings in context, Dr. Watson-Horzelski first described in detail the life-cycle of the [b]low [f]ly, the particular insect species she observed on the bodies of the victims. After an animal dies, she explained, flies are attracted to the decaying material, particularly any natural orifices or exposed wounds. During the first part of the cycle, the flies will mate and lay eggs. During the second part of the cycle, larvae hatch from the eggs and feed on the dead tissue. The larvae then transform into pupae during the third stage, and in the fourth and final stage, adult flies emerge from the pupae.

The rate of insect development, Dr. Watson-Horzelski said, depends on the species at issue, the microhabitat and the temperature. The warmer the temperature, the faster the rate of development. When insect specimens are collected from a dead body at a crime scene, ideally they are divided into two samples. Some are placed in isopropyl alcohol to preserve them at the particular life stage. Others are kept alive with something upon which to feed for the purpose of species identification.

Since insect species development rates are published from controlled environmental studies, Dr. Watson-Horzelski said, the first step is to identify the particular species involved. Once that is done, the examiner considers the environment where the body was found; this information helps the examiner determine how long it would have taken for the flies to land and begin laying eggs on the body. It is harder for the process to start in a new, pristine, airtight house than in a dirty environment (such as a house with rotting food present), where there are likely already insects present. At the time of her testimony, Dr. Watson-Horzelski had seen photographs of Betty's house at the time of the search; she opined that conditions inside the home were favorable for insect activity. At the storage facility where the victims' bodies were found, although the door was well-sealed, there was a rope protruding that would have made for easier access to insects. Dr. Watson-Horzelski noted that most of the fly activity was inside the Rubbermaid storage containers, which indicated that the insect activity began before the bodies were placed inside the containers.

Dr. Watson-Horzelski explained how ambient temperature factors into the calculation of fly development. Since ambient temperatures for the storage unit were collected in January 2003, several months after the victims' bodies were discovered in the unit, Dr. Watson-Horzelski calculated what the temperatures would have been inside the storage unit in October 2002 by using (1) those recorded temperatures, (2) the temperature deviations inside the unit as compared to outside the unit at that time, and (3) the outside temperatures recorded from the Tri-Cities weather station for October 2002. Dr. Watson-Horzelski admitted on cross-examination that she was unaware that the storage unit was not rented until October 10, 2002. She agreed that if the bodies had been "in an oven" before that time, it would have made a difference in her calculations. Based on the limited fly activity inside the storage containers, however, she believed that the victims were placed inside the containers soon after their death.

Dr. Watson-Horzelski testified that her examination of the fly activity present on the victims' bodies led her to conclude that Adam was killed before Samantha. She based her conclusion on the fact that the flies on Adam's body had matured to the one to four-day-old pupae stage, but the flies on Samantha's body had matured only to the larvae feeding stage; this suggested that some thirty-six hours separated the two deaths. Based on the insect activity present, Dr. Watson-Horzelski estimated that Adam died between October 5 and October 8, 2002, and that Samantha died between October 7 and October 12, 2002.

Washington County Sheriff's Investigator Todd Hull was also present at the autopsies of the victims. He testified that he transported tissue samples taken from both bodies to Dr. Arpad Vass, the State's forensic anthropologist in Oak Ridge, Tennessee. Dr. Vass testified that his analyses of tissue samples from the victims' livers and kidneys were consistent with the finding that Adam had died first, since Adam's liver, in particular, showed a more advanced stage of decomposition than did Samantha's liver. Dr. Vass estimated Adam's time of death as between October 4 and October 8, 2002, and Samantha's death as between October 6 and October 8, 2002.

Investigator Hull testified that from the time of [Petitioner's] arrest on October 11, 2002, there was a police presence outside Betty's Johnson City house at 104 Brentwood Drive. On October 14, 2002, the night Adam's severed head was found, the first search warrants were executed on Betty's home and Aunt Marie's home. After that, there were two more searches of Betty's house, one on October 17, 2002, and another on October 23, 2002.

Those searches yielded further evidence connecting the house to either the victim's bodies or the storage unit.

Investigator Hull testified that, after [Petitioner] was taken into custody, police continued to monitor his telephone calls from the jail. In a conversation on the morning of October 12, 2002, [Petitioner] told his mother to "do the things" he had previously instructed her to do, and to get some air freshener for "that stinking house." In response to information that police had towed his car (the blue Jeep), [Petitioner] commented that they were wasting their time because there was nothing in that car and never had been. In a later conversation between [Petitioner] and his Aunt Marie on October 13, 2002, Marie told [Petitioner] that his ex-wife Wilda knew that the blue Jeep wasn't "down there" and that he was in the red Jeep. The next day, on October 14, 2002, [Petitioner] had a conversation with his mother Betty in which she asked him what they were going to do about "moving the furniture," since "[i]t's padlocked." [Petitioner] asked her, "because of the check?" Betty responded that she didn't have $55. In context, it appeared as though [Petitioner] and his mother were discussing the 24-Hour Self Storage unit where the victim[s'] bodies were found.

On October 15, 2002, [Petitioner] and his mother discussed the police search of her home and Aunt Marie's home. Betty told him that law enforcement officers took her red Jeep and some clothing; she speculated that they took her clothing because they were looking for blood. She also indicated her belief that she would be charged as an accessory to murder. Further, she told [Petitioner] that police had found two severed hands and a severed head that had been identified by Adam's mother as belonging to Adam. Betty said, "I've not taken anything over there to the storage shed. I haven't been back 'cause I thought we were followed." When [Petitioner] started to respond, "Would you shut . . . ," Betty interjected, "They already know."

Finally, in a conversation on October 16, 2002, [Petitioner] called his Aunt Marie's house; his mother Betty was there, and he spoke to her. When [Petitioner] told Betty that he had been brought to the booking area of the jail, she told him that she understood he was being charged because they found a "big spot of blood["] in the blue Jeep. Betty also told him that the police took her car because they believed that he had driven it on Friday, October 4, 2002, with the victims inside. [Petitioner] denied doing so. Betty then proceeded to tell him that "Dick" had told her that, within a day or two, she would be charged as an accessory to the deaths of the victims on the

theory that she planned the murders and [Petitioner] carried them out. Betty complained that "they" had taken everything out of the garage during the search, including a George Foreman grill. When [Petitioner] exclaimed, "What in the damn hell is a George Foreman grill evidence to?" Betty responded, "I don't know, Howard. We probably cooked the parts before we got rid of them, okay?"

In 2002, Perry Allen was employed at the Washington County Detention Center; he testified about the telephone system in use at that time. After his arrest, [Petitioner] was incarcerated in a "lockdown pod," in which inmates were locked inside their cells for all but two hours a day. The telephone system in use [at] that time was the "Evercom System." Mr. Allen explained that although most telephone calls made from the pod were recorded, inmates could manipulate the system to avoid recording by calling an outside land-line, and then having that party make a third-party call. Although the outside land-line was recorded, sometimes either the third party's or [Petitioner's] conversation would not be recorded. Mr. Allen opined that, at the time [Petitioner] was incarcerated in Washington County, he may have talked to someone by telephone without the call being recorded.

Numerous law enforcement personnel from the [FBI], the [TBI], the Johnson City Police Department, the Washington County Sheriff's Office, and the 1st Judicial District Drug Task Force assisted in the execution of the search warrant at Betty's house. [FBI] Agent Drolshagen testified that there was a foul odor throughout the house, and especially in the garage. Inside the house, Agent Drolshagen observed, there was an enormous amount of debris on the carpet, including white paint stains and glass fragments. Those were collected for future analysis. Flies and fly larvae were present on the living room floor. One area of the living room carpet had a large bleach spot. In the dining room and hallway, portions of the carpet were "haphazardly cut" and had been removed.

Johnson City Police Department Officer Debbie Pattillo was present during the search of Betty's house and was also present during Samantha's autopsy. During the search, Officer Pattillo found inside a dresser drawer a pillowcase with a yellow and tan floral pattern. She said that the pillowcase found in Betty's home was identical to a pillowcase found inside the container with Samantha's body.

Police found many other items of evidence during the search of Betty's house that connected with either the storage unit or the Rubbermaid

containers that held the victims' bodies. Glass shards found in the carpet in Betty's home were identical to glass shards collected from carpet that was inside the container that held Samantha's body. Black nylon rope found inside the house was consistent with the texture and appearance of the rope tied around Adam's body. A swatch of fabric found beneath the garage door in Betty's home was consistent in appearance with a jacket found inside the container that held Adam's body. A pop-top air freshener found inside the house was the same type, brand, and scent as air fresheners found inside the storage unit.

Police also found a red Jeep parked behind Betty's house at the time of the search. While the inside of the house was definitely not clean, the red Jeep was extremely so. In fact, when police searched the premises, the carpeting inside the red Jeep was still damp. Agent Drolshagen testified that, despite the Jeep's clean appearance, he smelled a foul odor inside. The red Jeep was taken to the TBI for serology testing, but authorities found nothing in the Jeep to link it to either [Petitioner] or the victims.

Behind Betty's house and near a neighbor's outbuilding, Johnson City Police Department Lt. Steve Sherfey found an unloaded Rizinay 7.655 automatic pistol lying in grass. The neighbor, Larry Hendrix, told officials that he did not own the pistol and had never seen it. There were three unfired .32 caliber bullets lying on the ground within one foot of the gun. Lt. Sherfey turned over the gun to the Washington County Sheriff's Investigator Tommy Remine.

Inside Betty's garage, Drug Task Force Lt. Thomas Eugene Smith found a box of Winchester .32 caliber ammunition in a paper bag that was sitting on top of a dresser. The bullets were copper-jacketed.

Special Agent Don Carman, a forensic scientist in the firearms identification unit of the [TBI] laboratory, testified as an expert in the field of ballistics. Agent Carman examined the Rizinay 7.655 automatic pistol found in Betty's back yard, the box of .32 caliber ammunition found in Betty's garage, and the three bullets found near the pistol. Agent Carman noted that the pistol was a very old gun of Spanish origin, from the World War I era. Of the thirty-nine bullets in the Winchester box, thirty-seven were Winchester brand and two were Remington brand. He noted unique "bunter marks" on the three bullets found near the gun, which were identical to the bullets in the Winchester box. Ballistics comparison testing of sample bullets fired from the recovered pistol matched the bullet recovered from

Samantha's body. Agent Carman concluded that the two bullets were fired from the same pistol.

Special Agent Bradley Everett worked in the Serology/DNA Unit for the [TBI]. He testified as an expert in the fields of forensic serology and forensic DNA testing. Agent Everett participated in the retrieval of evidence from both the 24-Hour Self Storage unit and Betty's property. Included in the evidence recovered were three cigarette butts found on Betty's property. Special Agent Everett examined these cigarette butts for the presence of DNA. On one cigarette butt, he found DNA consistent with a female offspring of Patty Leming, Samantha's mother. On another cigarette butt, he found a mixture of DNA from the offspring of Patty Leming and an unidentified person. And on the third cigarette butt, he found a mixture of DNA in which a major contributor was a male offspring of Teresa Chrismer, Adam's mother.

Special Agent Everett also examined a Sears Craftsman electric chainsaw for the presence of serological evidence. There was a lot of debris on the chainsaw, but he could not visually identify the debris as human bone or tissue. Testing of the debris indicated the presence of human blood and human DNA, but it was so degraded that Special Agent Everett could not obtain a DNA profile. He testified that the chain on the saw was rusted. He acknowledged that outside exposure to weather could have affected the test results.

[Petitioner's] ex-wife Wilda testified that she married [Petitioner] in 1992 and they divorced in July 2002. They remained in contact after the divorce. Wilda recalled that, on October 4, 2002, [Petitioner] stopped by her house in Ft. Oglethorpe, Georgia, in Betty's red Jeep. Wilda saw a blonde female inside the Jeep and a young male standing outside the Jeep. The next time she saw [Petitioner] was on October 8, 2002, when he came down to talk to officers at the Bradley County Sheriff's Office. At that time, [Petitioner] told Wilda that he was unable to find the victims that day.

Either the day before or the day of [Petitioner's] arrest on Friday, October 11, 2002, [Petitioner] called Wilda and told her that "Patty [Leming]" had called to tell him that Samantha was missing and ask whether he knew of her whereabouts. When Wilda asked him where the victims were, he told her they had left Johnson City that morning. After [Petitioner's] arrest on October 11, 2002, either Betty or Marie called Wilda and conveyed

- 23 -

[Petitioner's] request that she meet him the following Monday at the federal court in Jonesborough, Tennessee.

In the meantime, the Bradley County Sheriff's Office asked Wilda to come to Johnson City, in Washington County. On October 15, 2002, Wilda went to Washington County and met with officers from both the Johnson City Police Department and the Washington County Sheriff's Office. In that meeting, Wilda agreed to wear a wire and meet with Betty and Aunt Marie; she planned to meet with [Petitioner] after that. Later, while Wilda was at Aunt Marie's home, [Petitioner] called and asked her to visit him in jail; he said he had some things to tell her.

On the evening of October 15, 2002, Wilda visited [Petitioner] at the Washington County detention center at his request. She was able to talk to him only through a Plexiglas window. Because the Plexiglas barrier made it hard to hear and communicate, [Petitioner] asked her to come back the next day with a tape recorder, a note pad, and a pencil. When Wilda told him she thought it would be hard to get in to see him a second time, he suggested that she bring a "fifty-dollar lawyer" with her and pretend to be his assistant, so that she could get inside and meet him face-to-face. He said he would then have the attorney leave the room so he could talk to her privately. On cross-examination, Wilda acknowledged that it was possible that law enforcement gave her money for a hotel room and meals for the night of October 15, 2002.

The following day, October 16, 2002, Wilda was wired again, and she paid another visit to Betty and Aunt Marie. Later, the wire was removed and she returned to the jail to meet with [Petitioner]. Wilda did not bring an attorney with her, but she brought the tape recorder and writing materials [Petitioner] requested. This time, they were able to meet in a private visitation room. Throughout Wilda's conversation with [Petitioner], he repeatedly turned the tape recorder on and off. During their meeting, [Petitioner] confessed to Wilda that he "blew [the victims'] brains out," cut off Adam's head and hands and threw them in the "river" near the Devault Bridge, then placed the remainder of Adam's body and all of Samantha's body in a storage unit. The gist of the conversation was that he had shot both victims at the same time on Sunday, October 6, 2002, at Betty's house. He indicated that he shot Adam first because Adam was "wild on something" and went "all to pieces" and came after [Petitioner], and then he shot Samantha immediately afterward. This conversation was recorded from a microphone hidden inside a trash can in the visitation room.

After her conversation with [Petitioner] on October 16, 2002, Wilda received numerous telephone calls from [Petitioner]. The Bradley County Sheriff's office had given her a tape recorder to record her conversations with [Petitioner]. She did so, and then passed the recordings on to both the Bradley County Sheriff's Office and the Washington County Sheriff's Office. Sometimes they provided her with blank tapes and other times she procured her own tapes. After the conversation in which [Petitioner] admitted that he had killed both victims, he never again expressly admitted his culpability to Wilda. However, some of the subsequent statements [Petitioner] made to her implicated him in the deaths of the victims. Wilda saw [Petitioner] on the last Monday in October 2002, before he was transported to New York to address his federal charges. He continued to call her after he arrived in New York. His story to her about the deaths of Adam and Samantha morphed over time; at one point he told her that Betty killed the victims, at another time he said that Samantha's brother Daniel killed them, and at still another time he claimed that the "Mafia" murdered them.

On January 1, 2003, at the request of [Petitioner] and his Aunt Marie and against the advice of the law enforcement authorities, Wilda flew to New York and visited with [Petitioner] face-to-face in a large community room at the New York facility where [Petitioner] was detained. She had no recording device with her during their in-person meeting and the conversation was not otherwise recorded. Wilda believed that, at the time, [Petitioner] was unaware that she had cooperated with law enforcement officers. During their conversation, [Petitioner] insisted that someone else had killed the victims. He asked Wilda to do several things for him when she got back to Tennessee. The first was to find a chainsaw that he claimed Betty had thrown out of a car window. [Petitioner] gave Wilda very specific directions on where to find the chainsaw. He told her that from Chattanooga, she was to take I-75 North, past the Ooltewah exit, and exit at a gravel pull-off for semi-tractor trailers. He instructed her to pull her car up to the guardrail, walk until she could no longer see her car, then look to her right in a ditch, where she would find the chainsaw. [Petitioner] asked Wilda to retrieve the chainsaw, clean it with gasoline to remove any fingerprints, and then take it to the home of Samantha's brother, Daniel Foster. Once at Foster's house, she was to break inside, steal some of Daniel's clothing, wrap the chainsaw in the clothing, hide the wrapped chainsaw under the trailer, and then anonymously tip law enforcement about where it was.

When she returned to Tennessee, Wilda stopped first in Washington County to meet with Investigator Hull, and then in Bradley County to talk to

Detective Shaunda Efaw. She related to them the instructions [Petitioner] had given her for retrieving the evidence. On January 3, 2003, accompanied by Bradley County Sheriff's Office investigators, Wilda located the chainsaw by using the directions [Petitioner] had given her during their New York meeting. During the search, Wilda received a telephone call from [Petitioner] as he directed her to the location of the chainsaw; that conversation was recorded. In a second conversation, also recorded, he directed her to find certain other items, apparently thrown from a bridge into a river. [Petitioner] told Wilda to take these items to Daniel's house along with the chainsaw. In the telephone calls from New York, [Petitioner] was emphatic that Wilda secure the chainsaw before searching for the other items, that she not take the chainsaw to her own house, and that the chainsaw not be discovered by law enforcement until all the items were together. Once that was achieved, [Petitioner] instructed Wilda, she was to "put the word out" on the street that she wanted information on Daniel.

Wilda continued to tape record her telephone conversations with [Petitioner] after she returned to Tennessee, and she gave copies of those recordings to the Washington County Sheriff's Office and the Bradley County Sheriff's Office. The gist of one conversation was [Petitioner's] claim that Samantha's brother, Daniel Foster, killed the victims at Betty's house the week before [Petitioner] was arrested. According to [Petitioner], Betty told him about the murders and warned him that Daniel was setting him up to take the blame. [Petitioner] said Betty never told him why Daniel killed the victims, but he understood that both victims were shot before Adam was dismembered.

In other telephone calls, [Petitioner] asked Wilda to relay to Investigator Todd Hull various "riddles" and pictures he had drawn, supposedly in an effort to "speed things up." [Petitioner] also related to Wilda a summation of his version of what happened in October 2002; Wilda understood that he wanted her to type it up and give it to the district attorneys, although she never did so.

On cross-examination, Wilda conceded that, during the fourteen years she and [Petitioner] were together, Betty Willis was a constant source of trouble. In 1993, Wilda took out a warrant against Betty. In 1999, when [Petitioner] filed for bankruptcy, Betty intervened and filed an objection to the bankruptcy. Wilda acknowledged that Betty routinely threatened other people's lives. She also conceded that [Petitioner] told her that he had tried to record Betty talking about the case before he was arrested and put into jail.

- 26 -

Wilda admitted that, at a hearing on November 30, 2004, she had testified that the only time [Petitioner] ever admitted to her that he had killed anyone was in a face-to-face conversation with him. She also admitted to having e-mail correspondence with Gertrude Lark, the sister of [Petitioner's] first wife, who had been missing for many years. In one of those e-mails, Wilda wrote that she believed that Betty was involved in the murder of the ex-wife, as well as "some of those other kids Howard was connected with in Georgia." In a later e-mail to Ms. Lark, Wilda wrote that she planned to ask the District Attorney to allow her to meet with [Petitioner] face-to-face and "push every button I can to get Howard to tell the truth about everyone."

## 2. Defense Proof

The defense theory was that someone other than [Petitioner] killed the victims. During [Petitioner's] cross-examination of Bradley County Sheriff's Detective Shaunda Efaw, he brought out the fact that his ex-wife, Wilda, had brought to her a letter postmarked October 8, 2002, from Chattanooga, Tennessee. During [Petitioner's] cross-examination of [TBI] forensic scientist Bradley Everett, he brought out that Agent Everett performed DNA testing on an envelope addressed to "Betty Hawk" [sic] that was postmarked October 8, 2002, and that a DNA profile developed from the envelope was consistent with the offspring of Samantha's mother, Patty Leming. Dr. Larry Miller, who earlier testified for the State as an expert in handwriting analysis, testified that he had examined the letter and envelope addressed to "Betty Hawk" and postmarked from Chattanooga, Tennessee, on October 8, 2002. He concluded that the handwriting on both the letter and the envelope was written by Samantha. He conceded that there was no way to know when the letter was written or who might have mailed the letter.

[TBI] Agent Bradley Everett testified that when he tested the white shoes and clothing [Petitioner] was wearing at the time of his arrest, he found no blood. He also conceded that no blood belonging to either victim was found at Betty's 104 Brentwood Drive address.

[Petitioner] introduced the testimony of Dr. Robert Allen, who in September 2002 was Betty's neighbor and her physician as well. Dr. Allen testified that, on September 15, 2002, Betty was hospitalized after she exhibited psychotic behavior, paranoia, and anxiety. In addition, Dr. Allen said, when he went into Betty's residence in mid-September 2002, he observed that it had been vandalized with graffiti on the walls. The refrigerator and other appliances were overturned, the toilets were busted,

and there was insect/maggot-infested food debris on the floor. On September 17, 2002, Dr. Allen wrote a letter to Betty's insurance company to support her claim of vandalism.

Dr. Neal Haskell, a forensic entomology consultant and professor of forensic science at St. Joseph's College in Rensselaer, Indiana, testified in rebuttal to the State's entomologist, Dr. Erin Watson-Horzelski. Dr. Haskell agreed with some of Dr. Watson-Horzelski's broader conclusions—the stage of development and the species of phorid fly. However, he believed there were major flaws in Dr. Watson-Horzelski's analysis of time of death. First, Dr. Haskell faulted her attempt to correlate the temperatures recorded by the weather station in October 2002 to the temperatures recorded inside the storage unit in January 2003, because a cold front had moved through the area in January 2003, so the temperatures were declining. Second, Dr. Haskell faulted Dr. Watson-Horzelski for using too few data points—he believed that she should have used between ten and twenty data points, and she only used four. Third, he perceived that her calculation of the "Kamal data" was flawed because she failed to reference a base temperature, a temperature below which fly development will not occur. In the formula for calculating the time of death, Dr. Haskell asserted, base temperatures are a required factor; different base temperatures will give different values. Fourth, he faulted her for using the same correction factor for the days before the bodies were placed inside the storage unit, because there was no information about where the bodies were on those days so it was impossible to know the microenvironment for fly development. Fifth, he faulted her for using the data for the Megaselia Scalaris sub-species of the phorid fly when the specific sub-species of phorid fly was unidentified. Finally, Dr. Haskell faulted Dr. Watson-Horzelski for assuming immediate colonization of the victim's bodies; he pointed out that phorid flies do not fly at night, so there could have been a delay in colonization. He testified that flies become active during the day, when temperatures reach fifty degrees or warmer. Given the uncertainties in the temperatures and the timing of colonization, Dr. Haskell claimed it was impossible to give a reliable and trustworthy estimate of time of death.

On cross-examination, Dr. Haskell conceded that he did not see the insect samples; in arriving at his opinion, he relied on Dr. Watson-Horzelski's reports. He was not sure whether he had been provided with all of her data when he was reviewing the case and forming his opinion. Dr. Haskell conceded that using weather reports from various agencies to calibrate the crime scene to the weather stations was a common practice. He

agreed with Dr. Watson-Horzelski's use of October 2002 temperatures for the ambient temperatures. Dr. Haskell maintained, however, that the flaw in her analysis was in using the January 2003 temperatures to calibrate the temperatures in the storage unit in October 2002, and argued that it would have been better to wait for the anniversary date and make the calculations as of that date. Dr. Haskell agreed that if there were already flies at the murder scene due to the presence of decaying food, it would be easy for the flies to reach the victims' bodies and begin the egg-laying process. When he was shown photographs of the insect activity in the containers that contained Adam's body and Samantha's body, Dr. Haskell agreed that the pupae in the container that held Adam's body would have been there longer than the larvae in the container that held Samantha's body. Nevertheless, Dr. Haskell said, he could not definitively state whether the victims were killed at different times because there were too many variables. When asked his opinion of forensic anthropologist Dr. Arpad Vass, Dr. Haskell indicated that he had respect for Dr. Vass and his work, but noted that Dr. Vass's work also depended on temperatures, so if the temperature readings were flawed, then Dr. Vass's results would be flawed.

[Petitioner] also presented the testimony of Pamela Marsh, the resident manager of the trailer park in North Georgia at which the victims rented a trailer on September 23, 2002. Ms. Marsh testified that [Petitioner] was with the victims when they rented the trailer, and that [Petitioner] paid their $190 deposit. On the evening of October 4, 2002, Adam came to Ms. Marsh's trailer to make a telephone call. She overheard him telling the person on the other end of the telephone line that he wanted to "come home." Later that same night, about 10:30 p.m., Adam came back to Ms. Marsh's trailer, turned in his key, and told her he was leaving to take care of a sick grandmother in Virginia. Adam sat with Ms. Marsh on her front porch until [Petitioner] drove up, and then Adam left with him. Ms. Marsh did not see Samantha leaving with Adam and [Petitioner].

Brandon Chancy was [Petitioner's] son-in-law. He owned the blue Jeep that was parked at Marie Holmes' house when police officers came to search the house. Mr. Chancy testified that the rear side window of the Jeep was broken and he used a blue tarp to cover it when it rained. He identified a photograph of Betty Willis and described her as an unusually strong woman. Mr. Chancy recalled one occasion when he saw Betty pick up a container filled with tools, chains, and ropes that he—a car mechanic—had been unable to lift.

Similarly, [Petitioner's] cousin, Steve Holmes, testified regarding Betty's mental illness, her violent nature, and her physical strength. Mr. Holmes' wife Brenda Holmes testified that, within a few days after [Petitioner] was arrested in October 2002, Betty came to the Holmes' house and told her that "Howard" had told her to get some things: a television, bolt cutters, a dolly, and a saw. Betty did not say why she needed those things; at the time, Ms. Holmes assumed they were needed to clean up her house, which had been ransacked. When Ms. Holmes commented on scratches she observed on Betty's arms, Betty alluded to [Petitioner's] "hot temper." Betty also remarked that she needed to move the refrigerator and that there were blood and maggots on the carpet. Ms. Holmes did not give Betty anything except the television. Later, however, she noticed that the two gasoline containers that had been sitting outside her garage door were missing.

To rebut Ms. Holmes' testimony, [Petitioner] recalled Investigator Todd Hull, who had monitored [Petitioner's] telephone calls from the jail to his mother. Investigator Hull did not recall [Petitioner] asking Betty to retrieve anything except a television. He did not recall [Petitioner's] ever asking for tools.

[Petitioner] also called criminal defense investigator Marc Caudel, who was appointed by the trial court to assist [Petitioner] in the investigation of the case. Mr. Caudel testified that, when he interviewed Brenda Holmes, she did not tell him that Betty Willis had told her that [Petitioner] had directed her to get the listed items. Similarly, Mr. Caudel claimed that Ms. Holmes never stated to him that Betty told her [Petitioner] had a bad temper. Ms. Holmes told Mr. Caudel that she was willing to testify for the State but she did not want to come testify for [Petitioner]. Accordingly, [Petitioner] had to subpoena her to testify.

After both parties rested their cases at the end of the guilt phase, the prosecutor made several comments during its closing arguments that [Petitioner] submits were improper. Specifically, the State commented that, in listening to the recordings of telephone conversations [Petitioner] had with Wilda and his mother, the jury should "know" [Petitioner] committed the killings by the "coldness in his voice." The prosecutor said of [Petitioner], "his coldness does him in." [Petitioner's] objection to the State's characterization was overruled.

After deliberation, the jury found [Petitioner] guilty of: (Ct. 1) the first-degree premeditated murder of Adam, (Ct. 2) the first-degree

premeditated murder of Samantha, and (Ct. 3) the felony murder of Samantha in perpetration of or attempt to perpetrate a kidnapping.

. . . .

As to the murder of Adam, the jury found aggravating circumstance (i)(13) (the defendant knowingly mutilated the body of the victim after death), and that this aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt; it imposed a sentence of death. As to the murder of Samantha, the jury found aggravating circumstances (i)(5) (the murder was especially heinous, atrocious, or cruel), (i)(6) (the murder was committed to avoid lawful arrest or prosecution of the defendant or another), (i)(7) (the murder was knowingly committed by the defendant while the defendant had a substantial role in committing the first-degree murder of Adam), and (i)(7) (the murder was knowingly committed by the defendant while the defendant had a substantial role in committing the kidnapping of Samantha). The jury found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and it imposed a sentence of death for Samantha's murder as well.

*State v. Willis*, 496 S.W.3d 653, 666-85 (Tenn. 2016) (footnotes omitted). Petitioner's convictions and sentences were affirmed on direct appeal. *Id*. at 737-38; *see also State v. Willis*, No. E2012-01313-CCA-R3-DD, 2015 WL 1207859, at *99 (Tenn. Crim. App. Mar. 13, 2015).

Thereafter, Petitioner timely filed a pro se petition for post-conviction relief, alleging various constitutional issues including ineffective assistance of counsel and denial of counsel. Following the appointment of post-conviction counsel, Petitioner filed an amended petition, to which the State filed a written response.

### *Post-Conviction Hearing Testimony*

At an evidentiary hearing, James Bowman ("Counsel Bowman") testified that he had practiced law for fifty-four years, that his practice consisted of primarily criminal defense work, and that, over his career, he has handled approximately twenty-five capital cases. He said that, in July 2003, he was appointed to represent Petitioner in Washington County on capital murder charges and that Stacy Street ("Counsel Street")[3] was appointed

---

[3] In 2013, Counsel Street was appointed as a Criminal Court Judge for the First Judicial District.

as co-counsel. He testified Counsel Street was one of the best attorneys he had known and that they had worked well together.

Counsel Bowman testified that, in late 2002, he was contacted by Assistant Federal Defender Nikki Pierce ("AFD Pierce"). He recalled that Petitioner had been arrested on a federal violation of probation warrant out of New York federal court and that AFD Pierce asked him to go to the Washington County Jail to speak with Petitioner about a state court matter. Counsel Bowman told AFD Pierce that, if Petitioner called him, he would go and speak with Petitioner. Counsel Bowman recalled that Petitioner called shortly thereafter, and he went to visit Petitioner the same day. Counsel Bowman testified that, after he spoke to Petitioner, he "advised Assistant District Attorney General Janet Hardin that [he] was [Petitioner's] attorney, and that they were not to speak with him about this state matter." He said that he represented Petitioner on a pro bono basis at that time. He recalled that Petitioner was not yet charged with murder when Petitioner was initially arrested on the federal violation of probation warrant in October of 2002.

Counsel Bowman testified that Petitioner was eventually taken by federal authorities to New York and that, while in New York, Petitioner was indicted on the state murder charges. Petitioner was arraigned on those charges when he returned to Washington County. While Counsel Bowman did not recall having done anything for Petitioner while Petitioner was in New York, he stated that, if he had been asked, he would have said that he represented Petitioner.

Counsel Bowman was shown a copy of a Petition to Divest, which was Exhibit 3 from a hearing held on April 27, 2021. He said that the document indicated it was filed by the State on December 30, 2002. In the Petition to Divest, the State sought to obtain raw footage of a video interview given by Wilda Willis to a local television news station regarding her knowledge of the case. Counsel Bowman stated, however, that he was not aware of the Petition to Divest at that time or at any time while representing Petitioner. He testified that he was never served a copy of the Petition to Divest, despite having informed law enforcement and the district attorney's office that he represented Petitioner. Next, Counsel Bowman was shown an order on the Petition to Divest that was filed on February 28, 2003, and was Exhibit 4 at the same April 2021 hearing. He agreed that the order indicated the court heard proof and arguments on the issue; Counsel Bowman indicated, however, that he had not been aware of the order at the time and did not recall ever being aware of it. Counsel Bowman noted that the documents indicated Wilda Willis testified at the hearing. He agreed that she had been a key witness at Petitioner's trial. Counsel Bowman stated that he had not been aware of the hearing at the time but that, if he had been aware of it, he "[a]bsolutely" would have wanted to be there to have the opportunity to cross-examine Wilda Willis.

Counsel Bowman said that he had been aware Petitioner was represented by counsel in New York, but he could not recall New York counsel's name. Counsel Bowman could not specifically recall if he had ever spoken with New York counsel; he said that, if he had spoken with New York counsel, he had not taken notes. Counsel Bowman agreed that, during his representation of Petitioner, he had a private investigator working on the case; he did not recall asking the private investigator to interview Petitioner's New York counsel. Counsel Bowman agreed that he filed a motion to suppress statements made by Petitioner to Wilda Willis and that a hearing was held on the motion. After reviewing the motion to suppress hearing transcript, Counsel Bowman testified that New York counsel did not testify at the hearing. Counsel Bowman stated that Petitioner made the statements to Wilda Willis prior to Counsel Bowman's pro bono representation of Petitioner.

Counsel Bowman testified that, over the course of his career, he had cases with "difficult clients." He testified that, although he had gotten along well with Petitioner, Petitioner had been a difficult client. Counsel Bowman explained that Petitioner "had his notion of what he wanted to talk about, and [Petitioner] had his notion of how he wanted to handle his case." Counsel Bowman stated that Petitioner had an absolute right to have his case handled however he wanted so long as it was "[w]ithin the law."

Counsel Bowman agreed that he eventually sought to withdraw from his representation of Petitioner. He was shown a March 15, 2005, transcript of a hearing on his and Counsel Street's motion to withdraw from representation of Petitioner. When asked if he could explain why he sought to withdraw from representing Petitioner, Counsel Bowman replied, "I can, but it would require a breach of the attorney[-]client privilege." He testified that he could not divulge confidences but that a conflict had arisen between counsel and Petitioner. The following colloquy then occurred during Counsel Bowman's testimony:

Q. At the time did you feel like you had a choice as to whether or not to withdraw from representing [Petitioner]?

A. If [Petitioner] wanted to pursue a certain course of action, I would not have had a choice.

Q. And I believe you told the Court a little bit ago that you felt that a defendant has the absolute right to choose their course of action within the law.

A. Within the law.

Counsel Bowman explained that, in his first meeting alone with Petitioner, Petitioner provided information to him that Petitioner never provided to another attorney, even when asked to do so by Counsel Bowman. Counsel Bowman testified that Petitioner's chosen path of defense prevented his further representation. Counsel Bowman stated it had been impossible for him as an attorney to pursue certain defenses because of the information Petitioner had provided during their first meeting.

Counsel Bowman reiterated that Petitioner was a difficult client. He testified, "[I]f we went down and said, '[Petitioner], we want to talk about this issue,' whatever that might be, if [Petitioner] didn't want to talk about that issue, it didn't happen. It would be, 'Well, I want to talk about this.'" Counsel Bowman described it as "frustrating" that Petitioner did not want to talk about some things and said that Petitioner sometimes wanted him and Counsel Street to investigate irrelevant matters. Counsel Bowman said that some of the communication problems he had with Petitioner stemmed from the fact that Petitioner "didn't want to repeat to anybody else what he had said to [Counsel Bowman] at that very first meeting."

Counsel Bowman recalled a report provided by the State from an insect expert, but he could not recall whether the defense spoke to a similar expert. He agreed the record demonstrated they had not sought funding for such an expert.

On cross-examination, Counsel Bowman testified that Steve St. John had been employed as a fact investigator for the defense, but he could not recall if they had employed a mitigation investigator. When asked if he ever had questions about whether the offenses occurred in Washington County as it related to filing a motion for improper venue, Counsel Bowman stated neither he nor Counsel Street had seen that as an issue.

Upon reviewing his motion to withdraw, Counsel Bowman agreed that the motion stated, "During this time both attorneys and all individuals who have been retained by the attorneys . . . to assist in this case have encountered constant difficulty in obtaining the cooperation of [Petitioner] in the preparation of a defense." The motion to withdraw also alleged that Petitioner had "consistently refused to cooperate in providing requested information" and that Petitioner had "insisted that the attorneys pursue factual investigations unrelated to this case." Counsel Bowman agreed that Petitioner had wanted to talk about things that were a waste of time, waste of resources, and not relevant to the case. Counsel Bowman agreed that he stated in the motion to withdraw that Petitioner had "insisted that the attorneys obtain evidence for him to review and then refused to review it."

Counsel Bowman further testified that it had been important for Petitioner to assist in the factual investigation of the case but that Petitioner had not done so. He said that,

although Petitioner provided background information, Petitioner refused to provide information when asked about the time surrounding the murders. He explained that Petitioner

> had critical information that . . . would affect the way we would pursue the case . . . , but my co-counsel didn't have that same information, and he wasn't repeating that same information to me now. So . . . that impairs your ability to prepare a defense, regardless of the ethical concerns that it might . . . raise.

Counsel Bowman indicated that, if the court had appointed a new attorney to represent Petitioner, then a conflict would not have existed—so long as Petitioner had not provided the same information to the new attorney that he had provided to Counsel Bowman in their first meeting.

Nikki Pierce ("AFD Pierce"), an Assistant Federal Defender in Greeneville, testified that she was appointed to represent Petitioner in federal court on October 15, 2002. She explained that Petitioner had federal charges out of New York and that he "was being called back to New York because there had been a pretrial violation alleged regarding those conditions of release pending sentencing." AFD Pierce testified that she represented Petitioner at a transfer hearing that was held before a magistrate judge in Greeneville, who ordered that Petitioner would continue to be detained and would be sent back to New York for a hearing on the alleged violations. AFD Pierce explained that Petitioner was detained in Washington County pending his transfer to New York.

AFD Pierce recalled that, after the hearing, she saw supervising U.S. Attorney Nancy Harr, who made a comment to her about the nature of the charges and an ongoing murder investigation. AFD Pierce further noted that there were more people present at Petitioner's hearing than would normally be there and that these things concerned her. She said that Petitioner was also represented at that time by Assistant Federal Defender Andrew Carter ("AFD Carter"), who was in New York. She stated that she called AFD Carter regarding Petitioner and sent him a fax of her notes from the transfer hearing. She testified that she also conveyed her concerns to him about the ongoing investigation. AFD Pierce testified that she also called the Washington County Sheriff's Office after the hearing; she said that, during the call, she invoked Petitioner's right to remain silent and informed the sheriff's office that both she and AFD Carter represented Petitioner.

AFD Pierce recalled that, sometime prior to October 18, 2002, she contacted Counsel Bowman, who agreed to represent Petitioner pro bono. She recalled that she set up separate three-way phone calls between Petitioner, AFD Carter, and Counsel Bowman.

AFD Pierce testified that, on October 17, 2002, the government filed a motion for stay of removal, in which the government asserted Petitioner's presence was needed in Washington County for an ongoing state murder investigation. AFD Pierce said that she did not receive a copy of the motion for stay of removal, or the court's order granting the motion, until the next day. She testified that it appeared the goal of the motion for stay of removal was to keep Petitioner in custody for questioning; as such, she filed a motion for reconsideration on October 18, 2002, in which she asserted that both she and Counsel Bowman had invoked Petitioner's right to remain silent and had communicated this to Washington County authorities.

By stipulation, the parties entered into evidence a deposition of William Lawson ("Counsel Lawson"), in which he testified that he had been appointed as lead counsel for Petitioner on May 31, 2005, and that attorney Gene Scott was appointed as co-counsel. Counsel Lawson said that he had handled two capital cases and several thousand other cases prior to being appointed to represent Petitioner. Counsel Lawson agreed that his fee claim form indicated that he consulted with an emergency room physician regarding the victims' autopsies and the police reports in September 2005. He testified that he did not recall speaking to any other experts.

Counsel Lawson testified that, when he was appointed, he believed that he would not be Petitioner's counsel for long because "of the pattern [Petitioner] had set of getting attorneys appointed and then moving to have them fired." Counsel Lawson stated that, at some point in his representation of Petitioner, he began to have problems with Petitioner; he said that his biggest issue with Petitioner was that Petitioner would not talk to him about the case. Although he had no independent recollection, Counsel Lawson agreed that Petitioner had filed a complaint against him with the BPR after being shown a copy of the complaint. He testified that he filed a motion to withdraw on September 28, 2005, after being told about the complaint by Petitioner on September 26, 2005.[4] Counsel Lawson agreed that at the hearing on his motion to withdraw, which was held on November 7, 2005, he referred to Petitioner as a "blatant prevaricator" and that he stated for the press at the hearing that this meant "liar." Counsel Lawson said that his motion to withdraw was ultimately granted by the trial court.

On cross-examination, Counsel Lawson stated that he began practicing law in 1984. He testified that, prior to his appointment on Petitioner's case, he had attended trainings on defending homicide cases and on capital case litigation. Counsel Lawson noted that Counsel Bowman had been appointed as first chair in Petitioner's case prior to his own appointment; he said that he had known Counsel Bowman for years and that he considered

---

[4] Despite Petitioner's telling Counsel Lawson about the complaint on September 26, 2005, records admitted at the hearing indicate that the complaint was not filed until October 11, 2005.

Counsel Bowman a "very experienced criminal defense lawyer." He testified that Counsel Bowman and Counsel Street had allowed him access to their files and that he reviewed those files. He testified that it would have been his normal practice to conduct his own investigation as well. Counsel Lawson stated he had attempted to go over the facts of the case with Petitioner but that Petitioner had refused to talk to him about the case. Counsel Lawson recalled that, when he would ask Petitioner about the allegations, Petitioner "would just look at [him] and then want to talk about something that happened in Georgia." He indicated that he had attempted to investigate despite Petitioner's lack of assistance. He did not recall if he had discussed the possible involvement of Betty Willis or of Daniel Foster. Although he had no independent recollection of Petitioner's statements to Wilda Willis, Counsel Lawson testified that, if Petitioner had made a confession to someone, that would have been something he would have wanted to discuss with Petitioner as any confession would have been problematic for the defense. Counsel Lawson testified that Petitioner never told him or suggested to him that he was innocent. He did not recall either the prior investigation or his own investigation producing alternative suspects. He testified that Petitioner never told him of any defenses to raise and that there was no evidence that Petitioner acted in self-defense, defense of another, or under duress.

Counsel Lawson testified that there was no reason to think Petitioner had standing to challenge the search of Betty Willis's house. He testified that, when he had asked Petitioner about where the deaths occurred, Petitioner had not answered. He said that Petitioner would not talk about how the bodies were in a storage unit rented in his mother's name. Counsel Lawson testified that Petitioner lied in the BPR complaint, which forced him to move to withdraw. He stated that Petitioner was unwilling to cooperate with him and that Petitioner's lack of cooperation prevented him from doing his job properly.

Counsel Lawson agreed that the theory of defense must be credible because credibility with the jury is important. He also agreed that credibility with the jury must extend to sentencing as well. Counsel Lawson stated that, in his view, Petitioner's case was going to be a penalty phase case because the evidence of Petitioner's guilt was strong. He testified that the defense had needed Petitioner's complete cooperation, which they had not been given. Counsel Lawson said that this made it nearly impossible to adequately represent Petitioner.

Gene Scott ("Counsel Scott") testified he has been practicing law since October 2001, with his primary focus being on criminal law. He testified that he was appointed to represent Petitioner on May 31, 2005, as second chair to Counsel Lawson. Counsel Scott explained that Counsel Lawson eventually moved to withdraw but that Counsel Scott stayed on the case because he had no issues with Petitioner at that time. When asked about his observations of how Petitioner and the trial court interacted during court proceedings, Counsel Scott stated that "in all fairness, they clashed."

Counsel Scott stated that Counsel Woody Smith replaced Counsel Lawson and that he and Counsel Smith worked together on the case until April 2008. He agreed a lot of work had been done on the case by the time he was appointed. He noted that several attorneys had worked on the case, that Michael Cohan was working as an investigator, and that Rhonda Lakin was working on mitigation evidence. Counsel Scott testified that, after his appointment, Rosalind Andrews was hired as a mitigation specialist, and he hired private investigator Steve St. John. When asked if time of death was an issue they considered or thought was important, Counsel Scott said that they may have discussed it, but he could not recall specifically because it had been fifteen years since he had withdrawn from the case. He stated that he believed Washington County was the proper venue for the case and that they developed no information from Petitioner or during their investigation which indicated the crimes did not occur in Washington County.

Counsel Scott recalled that the issue of the motion to suppress was a "big issue" in the case. Counsel Scott agreed that the statement was damaging and that Petitioner was "very interested in litigating a motion to suppress[.]" He noted that Counsel Bowman and Counsel Street had previously litigated the issue but that he and Counsel Smith had relitigated the issue for Petitioner.

Counsel Scott agreed that Petitioner had also wanted to litigate a motion to suppress any evidence found in Betty Willis's house. Counsel Scott said that he advised Petitioner against such a motion because he believed "the best way to try the case was to pin it on [Petitioner's] mother." He explained that his interactions with Betty Willis led him "to believe that she could have been involved with the killing." He noted that she had been charged as an accessory after the fact. He said that she attempted to speak to him several times but that he refused to talk to her because she was represented by counsel. He noted that, when Betty Willis began representing herself, he interviewed her at the Unicoi County Sheriff's Department. Counsel Scott stated that he thought she was a viable alternative suspect because "on her answers to questions as they related [to] Samantha, it was like a match in gasoline." He stated that, to file a motion to suppress evidence from the house, Petitioner needed to show standing. He indicated, however, that it was the defense position that Petitioner did not want to tie himself to the residence; he said that they had wanted to distance Petitioner from the residence. Counsel Scott indicated that, if he had thought suppression was a "slam dunk[,]" then he probably would have pursued it despite the standing issue. He stated, however, that he did not think the suppression issue was a winning issue.

Counsel Scott agreed that there had been motions to withdraw filed, and he recalled the hearing on March 19, 2007, in which the trial court instructed him and Counsel Smith to have a "prayer meeting" with Petitioner and try to work out their differences. He stated that, after the hearing, he filed a motion to suppress Petitioner's statements. He agreed

that, at a hearing on June 11, 2007, he and Counsel Smith indicated that they no longer wanted to withdraw from the case, and Petitioner withdrew his complaints against them, stating that "they assured me they will do the work I want done." Counsel Scott agreed that a hearing on the motion to suppress occurred after the June 2007 hearing but that AFD Carter was not subpoenaed and was not called as a witness at the hearing. Counsel Scott stated that he and Counsel Smith eventually filed another motion to withdraw after Petitioner filed an additional complaint with the BPR and indicated that he had filed a federal lawsuit against them.

Counsel Scott agreed that, after Counsel Lawson withdrew as lead counsel, Petitioner's trial date was continued. He did not recall, but did not dispute, that the next scheduled trial date was in September of 2006. Counsel Scott identified an *ex parte* order dated August 23, 2006, which indicated that the Administrative Office of the Courts had approved funding for investigative services by Mr. St. John. He agreed that, on August 18, 2006, he filed a motion to continue Petitioner's trial and that this motion was granted after a hearing. He said that the trial was continued until October 29, 2007; he said that, at this trial setting, the jury pool was depleted before the jury was selected, and as a result, the trial did not occur. Counsel Scott agreed that the case was reset to July 14, 2008, but that this trial date was canceled after the trial court allowed him and Counsel Smith to withdraw in April 2008.

Woody Smith testified that he was appointed as lead counsel in Petitioner's case in November 2005. He stated that the trial court judge had run out of qualified Washington County attorneys and had reached out to a judge in Greene County to ask for a recommendation of a qualified attorney who could get along with a "difficult defendant." Counsel Smith indicated that his name was given to the trial court because he had previously handled several capital cases, with two of the cases going to trial. Counsel Smith stated that attorney Gene Scott was appointed as second chair.

Counsel Smith recalled that, by the time of his appointment, a motion to suppress Petitioner's statements to Wilda Willis had already been litigated; he could not recall if Petitioner had wanted the issue relitigated upon his appointment. After being shown "Motion I/63: Motion to Suppress Evidence," Counsel Smith agreed he and Counsel Scott had filed the motion, but he could not recall if the motion had been a point of contention between himself and Petitioner. Counsel Smith acknowledged that there had been a lot of contention between himself and Petitioner "off and on," but he could not recall specifics. Although he did not specifically recall the hearing, Counsel Smith did not dispute that, if the record indicated, there was a hearing on the motion to suppress and that AFD Carter was not called as a witness.

Counsel Smith agreed that he reviewed the State's discovery in preparation for trial; he recalled reviewing two expert reports contained therein but testified that he had not consulted a forensic anthropologist or a forensic entomologist. He said that he had no expertise in these fields and that he discussed with Counsel Scott and Petitioner whether they should consult with such experts. He testified, however, that they "ultimately came to the conclusion that [Petitioner's] defense being he simply didn't do it, then—then some of the scientific issues were not as important and they—as they would have been had a different defense been offered." Counsel Smith testified that they also discussed the possibility of having Petitioner undergo a psychological examination but that they did not pursue it because they did not want to provide the results of such an examination to the State for use in cross-examination should Petitioner decide to testify.

Counsel Smith testified that the defense employed private investigator Steve St. John to work on Petitioner's case. He recalled that, at some point, Mr. St. John stopped working on the case, and they employed a new investigator, Michael Cohan. He said that Mr. Cohan primarily contacted him via email and phone and, occasionally, in person. A letter dated April 18, 2006, from Mr. Cohan to counsel was shown to Counsel Smith. Counsel Smith agreed that the primary purpose of the letter was to advise him that because Petitioner was persistently calling Mr. Cohan from the Washington County Jail, Mr. Cohan blocked the jail's number from his office phone. Counsel Smith noted that Mr. Cohan also indicated in the letter that he was out of funding to do any additional work on the case. Counsel Smith did not dispute that Mr. St. John may have come back on the case if that was what the record indicated; he did not recall.

On cross-examination, Counsel Smith testified that the contention between him and Petitioner generally involved issues of trial strategy and a difference of opinion as to what Petitioner wanted to do versus what Counsel Smith and Counsel Scott thought should be done. Counsel Smith testified that the defense strategy "was to cast doubt on [Petitioner's] guilt by trying to show the jury that his mother was—Betty Willis was a more likely suspect as to who actually was the killer." Counsel Smith indicated that Petitioner was "torn" about blaming his mother and that sometimes Petitioner was agreeable to the defense strategy and sometimes not.

Counsel Smith agreed that he filed several motions to withdraw from representing Petitioner. Counsel Smith explained that there were hearings on the motions and that the trial court would encourage he and Counsel Scott to talk with their client to attempt to resolve the issue. He also recalled Petitioner's filing complaints against him with the BPR; he did not recall the specifics but assumed the complaints were all either dismissed or withdrawn. Counsel Smith agreed that the complaints to the BPR and the contentious relationship with Petitioner had an impact on counsel's ability to represent Petitioner. He

said that it resulted in his and Counsel Scott's having to spend time on matters that were not productive toward defending Petitioner.

Counsel Smith testified that, at a hearing on a motion to withdraw in March of 2007, the trial court told counsel and Petitioner that they needed to have a "prayer meeting." Counsel Smith testified that they did have a meeting but "without the prayer" and that, as a result, he and Counsel Scott remained on the case. Counsel Smith noted that he believed they were effective in their continued representation of Petitioner.

Counsel Smith testified, however, that he and Counsel Scott ultimately reached a point where they contacted the BPR and were instructed to withdraw from representing Petitioner further. Counsel Smith said that he could not recall the specific details but that the trial court granted their motion to withdraw thereafter. Counsel Smith could not recall if his withdrawal was based upon a federal lawsuit filed by Petitioner against him or if his withdrawal was necessitated by a complaint filed with the BPR by Petitioner. He stated, however, that the BPR concluded "the relationship at that point was so adversarial as to not allow . . . [counsel's] representation to go further." When asked whether he ever saw an avenue to claim that the crimes did not occur in Washington County, Counsel Smith stated that they discussed that but that he did not recall ever thinking that "it would get us anywhere based on the circumstances."

Next, a videotaped deposition of Assistant Federal Defender Andrew Carter was introduced, in which he testified that he was currently a United States District Court Judge in New York but that he previously worked as an attorney with the Federal Defender's Office in New York. AFD Carter stated that, during his time as a federal defender, he was assigned Petitioner's drug-related case; he said that, at the time, Petitioner was on release status out of New York.

AFD Carter testified that Petitioner called him in October 2002, after Petitioner was arrested. AFD Carter testified that, although he could not recall the specific date of the call, he called the Washington County Jail on speaker phone with a paralegal present on the same day that he received Petitioner's call. AFD Carter said that the intent of the call was to protect and invoke Petitioner's right to counsel when questioned about the federal case and the state murder charges until local counsel was located for Petitioner. He recalled calling the jail twice—once to invoke Petitioner's rights and then again when Petitioner's clothing was taken and Petitioner was placed on suicide watch.

AFD Carter testified that he was contacted by an investigator working on Petitioner's case two times. He stated that he was contacted sometime around December 2006 and that he was asked about his phone calls to the Washington County Jail. He said

that he was never asked to testify at a suppression hearing but that he would have testified if he had been asked.

Steve St. John testified that he worked on Petitioner's case as a private investigator for the defense. He stated that he prepared memos for Petitioner's counsel concerning his work on the case and that he typically hand-delivered or emailed the memos to counsel. After being shown a memo to Counsel Smith and Counsel Scott dated December 11, 2006, which covered Mr. St. John's activity from August 2006 to the date of the memo, Mr. St. John testified that the memo showed he spoke to AFD Carter in New York on December 6, 2006. The memo indicated that AFD Carter informed Mr. St. John that he had called the jail in Washington County twice—once to invoke Petitioner's right to remain silent and again after Petitioner was placed on suicide watch.

Mr. St. John was shown a document consisting of handwritten notes he made during an interview with Joy Gadd. According to his notes, Mr. St. John conducted the interview on April 23, 2004, at Counsel Bowman's office with Counsel Bowman, Counsel Street, and Petitioner's aunt, Marie Holmes.

Assistant District Attorney General Dennis Brooks ("General Brooks") testified that former District Attorney Joe Crumley ("General Crumley") and former Assistant District Attorney Steve Finney ("General Finney") had originally represented the State as the prosecutors in Petitioner's case. General Brooks said that he was only "tangentially involved" in the case at that time, doing research for Generals Crumley and Finney. He stated that, when General Finney left the District Attorney's Office, he became second chair to General Crumley on Petitioner's case. General Brooks explained that he became lead counsel after District Attorney General Tony Clark[5] ("General Clark") was elected and replaced General Crumley. He said that General Clark came onto the case as second chair for the State and that he and General Clark remained the prosecutors on Petitioner's case until the appeal. He agreed that Petitioner was originally represented by counsel but represented himself at trial.

General Brooks agreed that prosecutors have a duty under *Brady* and *Johnson* to turn over any exculpatory evidence that could benefit the defense. He defined "exculpatory" as being "anything pointing towards . . . innocence or, as I understand, it can also be impeachable evidence against a material State's witness." General Brooks was shown a document entitled "State's Response to Defendant's Motion to Compel Disclosure of Brady Material[,]" which he had filed pretrial, and he was asked about the specific wording in the pleading. General Brooks acknowledged that he had not included in his response that he would provide information that would lead defense counsel to conduct a

---

[5] General Clark passed away in 2018, while in office.

"possibly fruitful investigation." He further testified that it was his belief that "ultimately whatever is at question to be disclosed needs to be admissible in some form eventually before it's relevant." General Brooks initially stated that he could not recall how long he spent on the discovery response, but he agreed that he testified at a previous hearing that he "probably didn't spend more than one minute thinking and talking or writing that response. I'm a pretty fast writer."

General Brooks testified that, at the time he filed the response, he had not considered information relating to Tom Smith ("Mr. Smith") and Tom Remine ("Mr. Remine") to be covered by *Brady*. He said that he could not recall whether Mr. Remine, who had been a law enforcement officer, had been terminated from or quit law enforcement under circumstances which were the equivalent of a termination. General Brooks indicated that, at some point, he may have known or he may have assumed it was a termination. General Brooks agreed that, in a sworn affidavit he had submitted in response to Petitioner's Motion to Disqualify the District Attorney's Office, he had used the term "terminated" when referring to Mr. Remine. Regarding the circumstances of Mr. Remine's departure from the sheriff's department, General Brooks stated that his "understanding of the situation back at the time with the sheriff's department was that Mr. Remine's son had gone through a traumatic medical event, and he had smoked marijuana—Mr. Remine had—and that became an issue with the sheriff's department." General Brooks said that he had believed Mr. Remine had been terminated but that he also understood that Mr. Remine may have been forced to resign. He again agreed that he said in his affidavit Mr. Remine's employment was terminated but that he now could not say for sure that he "really knew it was a termination as much as it looked like a termination."

General Brooks agreed that General Clark asked the TBI to investigate the drug evidence inventory at the sheriff's department to ensure that there was no missing evidence. General Brooks stated that he did not recall any information related to the end of Mr. Remine's employment ever being turned over to Petitioner or any of his attorneys, and he said that he never personally turned over such information. General Brooks testified, however, that it was "common courthouse knowledge that the situation existed" and that most of the defense bar knew about it. After reviewing a transcript, General Brooks agreed that, at a bench conference, General Clark advised the trial court that the next State's witness was Mr. Remine who was a "former investigator with the Washington County Sheriff's Department. Mr. Remine was . . . let go or resigned because of his use of narcotics, marijuana, about a [year]-and-a-half ago." He also agreed that later in the transcript General Clark stated, "[Mr. Remine] left of his own accord." When asked why he had not corrected General Clark's misstatement with the trial court, General Brooks stated that he had not been privy to the conversations related to the ending of Mr. Remine's employment, and he had not known for sure if it was a termination or if Mr. Remine had been allowed to resign.

General Brooks testified that Mr. Smith had been a law enforcement officer involved in one of the search warrants early in the case, prior to General Brooks' involvement. He acknowledged that he had heard Mr. Smith had been barred from Judge Cupp's courtroom after a federal magistrate found Mr. Smith to not be a credible witness. General Brooks stated, however, that he did not know any specifics. He explained that he did not have regular dealings with Mr. Smith, so he never inquired about the issue. General Brooks acknowledged that he should have been more proactive in discovering any issues with a State's witness's credibility prior to calling the witness to testify; he said that he believed General Clark "probably had a handle on that situation." General Brooks testified that it was "common . . . courthouse knowledge that Mr. Smith had issues in Greeneville" and that Petitioner would have been aware of it through past counsel, elbow counsel, or otherwise. General Brooks said that Petitioner had knowledge of the situation because Petitioner himself had brought the issue up during trial. General Brooks did not recall making any disclosures to Petitioner related to Mr. Smith; he agreed that the trial transcript indicated General Clark was aware of Judge Cupp's having banned Mr. Smith and why. General Brooks agreed that, under *Brady* and *Johnson*, the State is required to provide the defense with evidence that could provide grounds to attack the reliability, thoroughness, and good faith of the State's investigation. He again acknowledged that he had not provided any information to Petitioner concerning Mr. Remine or Mr. Smith.

General Brooks testified that he did not recall doing any investigation into the disciplinary record of the State's expert witnesses. General Brooks testified that he did not have any reason to doubt Dr. Vass's testimony concerning time of death or the science behind his testimony. When asked about Dr. Stephens, who performed the victims' autopsies, General Brooks agreed that she would have been the person to provide samples from the victims to Dr. Vass. General Brooks testified that he recalled hearing something about Dr. Stephens being reprimanded for "unprofessional, dishonorable, or unethical conduct not consistent with the high standards of professional practice[.]" He recalled that the reprimand had something to do with Dr. Stephens's ex-husband, who was also a pathologist, and the improper storage of certain body parts when she moved. General Brooks stated that he did not recall ever speaking to Dr. Stephens about this. General Brooks said that he had the highest regard for Dr. Stephens and her capabilities as a forensic pathologist. He acknowledged that he did not make any inquiry to determine if items related to Petitioner's case were properly stored and that he did not speak with Dr. Vass concerning whether proper storage of the samples could have impacted his results. He stated he did not provide any information about this to Petitioner.

On cross-examination, General Brooks testified that he never had any reason to believe Dr. Stephens did anything improper in the cases they had worked on together. He noted that Dr. Stephens had maintained her position at East Tennessee State University and

then attained a position of a similar nature in the Cincinnati area by the time of Petitioner's trial.

Marcus Caudel ("Mr. Caudel") testified he had worked as a criminal defense investigator and mitigation specialist since 2002 and that he was appointed to work on Petitioner's case as a fact investigator. Mr. Caudel testified that he had previously worked on capital and non-capital cases in state and federal courts. When asked if Petitioner's case was a complex case, he responded "very much so." He indicated that there were numerous boxes of discovery materials in the case and that there were a lot of witnesses scattered all over in multiple states, not just in Washington County.

Mr. Caudel recalled that, while Petitioner was appealing the trial court's ruling that Petitioner would be required to represent himself, Mr. Caudel delivered some documents for Petitioner, who was in jail at the time, to attorney Gerald Gulley in Knoxville. He further recalled that the trial court had ordered Mr. Caudel to stop working on Petitioner's case pending the interlocutory appeal. Mr. Caudel testified that he did not work during that time. He said that, when he was instructed to stop working, he had just gotten started on Petitioner's case. Mr. Caudel said that he had no notice of when he was allowed to start working again after the appeal and noted that he was working on other cases at the time.

Mr. Caudel recalled testifying before the trial court when Petitioner asked for a trial continuance after the conclusion of the interlocutory appeal. He said that, although the trial court granted Petitioner's request for a continuance, the new trial date did not give him enough time to do a complete investigation. He indicated that there had just been too many witnesses to track down in multiple states and too much discovery for the time allowed.

Mr. Caudel stated that Petitioner was difficult to work with; he stated he spent a lot of time on the phone with Petitioner and that they ultimately worked through any differences they had. Mr. Caudel recalled times when Petitioner would call him wanting something done urgently in Washington County, and he would be in another state or busy doing something else.

Gerald Gulley ("Counsel Gulley") testified he had been practicing law since October 1989. He stated that his practice is split between criminal defense and some civil work, that he does criminal appellate work, and that, for a period in the 1990s, he was a contract appellate defender for the Public Defender's Conference for the State of Tennessee. Counsel Gulley explained that he was appointed to represent Petitioner in the interlocutory appeal on June 30, 2008. He noted that the order appointing him to represent Petitioner also stayed the case in the trial court pending the interlocutory appeal. Counsel Gulley testified that the motion for interlocutory appeal was prepared without his assistance and that he did not think it was something he relied upon in preparing the appellate brief.

- 45 -

He indicated that, in preparing his brief, he had the transcripts and technical record from the case.

Counsel Gulley agreed that his records indicated he received and reviewed a letter from Petitioner on September 8, 2008. He further agreed that he filed a brief with the appellate court on October 22, 2008. Counsel Gulley acknowledged that, in its order, the trial court found that Petitioner "did not get along with his first two lawyers." Counsel Gulley recalled from the transcripts that, with the first two attorneys appointed to represent Petitioner, there had been one motion filed by Petitioner and one by counsel to change counsel. He recalled that the trial court denied the first motion but granted the second. Counsel Gulley agreed that he never sought to have the record on appeal supplemented or to have the case remanded for further fact-finding; he testified, "In my review of the transcripts of the proceedings, to me they appeared to be fairly extensive. And I didn't see a need for that." Counsel Gulley agreed that the sole issue identified in the interlocutory appeal was whether Petitioner had forfeited or waived his right to counsel.

Counsel Gulley could not recall having contacted Petitioner's prior attorneys. He agreed that he did not consult with Petitioner to discuss what had occurred with prior counsel; he said that he believed he was constrained to the existing record. He testified, "So in my review of the transcripts of the various motion hearings related to the motions to relieve counsel or to withdraw, there [was] nothing that I recall that would lead me to believe that, you know, further fact-finding or discussions with trial counsel would be necessary." Counsel Gulley agreed that, when an appellate record is incomplete, there are proceedings to supplement the record with what is missing from the record.

Regarding his argument on appeal, Counsel Gulley said that he argued Petitioner had not forfeited or waived his right to counsel and that Petitioner's case was distinguishable from *State v. Carruthers*, 35 S.W.3d 516 (Tenn. 2000), which was the leading case in Tennessee on the issue. He agreed that, broadly speaking, *Carruthers* essentially held that a defendant can, by his own actions, act so badly toward trial counsel that he forfeits or waives his right to trial counsel. When asked whether anyone had told the appellate court how Counsel Bowman had indicated an "actual conflict of interest" at the withdrawal hearing, Counsel Gulley stated that the transcripts of the hearing had been a part of the appellate record before the court. He agreed that he had not spoken with Petitioner about why Counsel Smith and Counsel Scott had withdrawn but said that he had read the transcripts to find out what had occurred. He stated that he also reviewed the transcript of Counsel Lawson's withdrawal hearing and Counsel Lawson's responses to the trial court's questions.

When asked about defendants filing complaints with the BPR, Counsel Gulley responded, "I would certainly agree that the complaint process to the [BPR] has been

weaponized by—often. And I—as I recall, in reviewing the transcripts, there was some comment by [the trial court] about [Petitioner] wanting to get Herb Moncier appointed." Counsel Gulley testified that, from his review of the various hearing transcripts,

> most if not all of the lawyers complained that [Petitioner] had filed board complaints against them. One of them referred to the fact that a federal lawsuit had been filed against them. A couple of others, you know, testified that lawsuits or intent to file lawsuits against them by [Petitioner] had occurred.

He said that, during the hearings, the trial court addressed counsel, as well as Petitioner concerning the basis for the motion to withdraw.

Counsel Gulley agreed that the interlocutory appeal opinion stated as follows:

> The trial court gave [Petitioner] ample opportunity to show via argument, document, and testimony, that he was justified in complaining about counsel's performance.

> Nevertheless, [Petitioner] neither articulated nor established any basis for complaint against any of his attorneys.

When asked whether his appellate brief had asserted any conflict of interest for Counsel Bowman and Counsel Street or any failures on the part of Counsels Lawson, Smith, and Scott, Counsel Gulley said that the brief would "speak for itself."

Counsel Gulley testified that he advised Petitioner by letter dated July 8, 2008, of the appellate court opinion and asked whether Petitioner wanted to file a Rule 11 application. Counsel Gulley agreed that Petitioner was unhappy with the result of the appeal and that Petitioner sent a letter to the BPR in 2009, complaining that Counsel Gulley had not raised the issue of ineffective assistance of trial counsel. Counsel Gulley identified a copy of email correspondence between himself and the BPR concerning Petitioner's letter, in which he stated that issues of ineffective assistance of counsel were generally more appropriate for post-conviction proceedings. He agreed that Petitioner sent an additional complaint against him to the BPR in 2013.

On cross-examination, Counsel Gulley testified that he did not meet with Petitioner in person; he stated that he did not feel an in-person meeting was necessary. He testified that he corresponded with Petitioner by letter during his representation. Counsel Gulley reiterated that he felt his representation was limited to the issue identified by the appellate court and to the record, transcripts, and technical record. He said that he did not believe

the record needed to be supplemented and that the transcripts were extensive, containing statements from counsel and Petitioner.

Counsel Gulley testified that actual conflicts of interest may be created by a defendant. He agreed that an actual conflict of interest may arise in various ways, including a defendant's wanting counsel to lie to the court or present false information. He said that a conflict of interest could also arise when counsel and a defendant disagree on strategy and the relationship breaks down to where the defendant is no longer communicating with counsel. Counsel Gulley agreed that another way a conflict arises is when a defendant files a complaint with the BPR or lawsuits against counsel.

He stated that the decision about what issues to raise on appeal was a decision left to the discretion and professional judgment of counsel and that issues with no merit or which would distract from critical issues may not be included, citing *Carpenter v. State*, 126 S.W.3d 879 (Tenn. 2004). Counsel Gulley testified that he had not seen any evidence in the record that Petitioner's counsel was ineffective; further, he testified that he saw no basis to request that the record be supplemented to establish this. He again stated that it would not have been appropriate to raise post-conviction issues during the interlocutory appeal.

James Simmons ("Counsel Simmons") testified he had been practicing law in Tennessee since 1981 and that he practiced criminal law almost exclusively, at both the trial and appellate level. He said that he was appointed to represent Petitioner on his motion for a new trial and on direct appeal. Counsel Simmons testified that Petitioner, along with elbow counsel, had filed an initial motion for new trial on June 22, 2010, prior to his appointment. Counsel Simmons testified that he, along with co-counsel Patrick McNally ("Counsel McNally"), filed an amended motion for new trial on November 4, 2011, and a second amended motion for new trial on April 5, 2012. Counsel Simmons stated that he and Counsel McNally later filed a notice of appeal and an appellate brief on Petitioner's behalf.

Counsel Simmons was shown the Petition to Divest and the corresponding order; he testified that he did not recall having seen the documents during his representation of Petitioner. Further, he did not recall raising an issue related to the Petition to Divest, Petitioner's lack of notice of the petition, or Petitioner's not being present for the hearing. Counsel Simmons testified that, to his recollection, the failure to raise the issues would not have been the result of a decision by himself or Counsel McNally.

Kathleen Morris ("Counsel Morris") testified she had been a practicing attorney for over thirty years and that she had been appointed to represent Petitioner while his case was on direct appeal. Counsel Morris stated that she worked on the case as co-counsel

alongside lead counsel, Hershel Koger ("Counsel Koger").[6] She said that she and Counsel Koger took over Petitioner's case from Counsel Simmons and Counsel McNally, who had already filed a direct appeal brief. Counsel Morris explained, however, that she and Counsel Koger met with Petitioner and learned that Petitioner was unhappy with the brief; she said that she and Counsel Koger ultimately withdrew the original brief and filed a new one. Counsel Morris said that she met with Petitioner because as appellate counsel, she "had a duty to consult with a client." She explained that she and Counsel Koger had known that Petitioner had represented himself at trial. She said that, as such, Petitioner had a "bird's-eye view . . . of [the] concerns he had about the case."

Counsel Morris was shown the Petition to Divest and the corresponding order. She testified that, although post-conviction counsel had shown the petition and order to her in prior conversations, she did not recall seeing them previously. Counsel Morris said that she and Counsel Koger had gone through the record in Petitioner's case, which she described as "vast." She explained that they divided the record between them in order to look for things they needed for the appeal. Counsel Morris testified that because she had not seen the petition and order previously, she assumed Counsel Koger had seen them in the portion of the record he had reviewed.

Counsel Morris agreed that, if there was a record of a hearing in which Petitioner and/or his attorney had not been present and had not received notice, then it would have been an important issue to consider. She agreed that she would have wanted counsel to be present and involved in any hearing concerning the credibility of a witness for the State. Counsel Morris testified that she and Counsel Koger did not include in the appellate brief any issues relating to the Petition to Divest and subsequent order, noting that they were limited to raising the issues included in Petitioner's motion for new trial. Counsel Morris acknowledged that they did not raise the issue as plain error, but she stated it was not a strategic decision on her part because she had not seen any documents relating to the Petition to Divest.

Dr. Arpad Vass testified he obtained a PhD in forensic anthropology from the University of Tennessee in 1991 and had been working generally in that field since then. He said that his interest was in forensics and that his PhD dissertation was on "time since death" determinations. Dr. Vass recalled working on Petitioner's case in 2004. He said that he was employed at the Oak Ridge National Laboratory at the time, where eighty percent of his work was on classified projects, and the remainder was on issues for organizations like the National Institute of Justice and the National Institute of Health.

---

[6] Counsel Morris explained that Counsel Koger passed away about a year before the post-conviction evidentiary hearing.

In relation to Petitioner's case, Dr. Vass testified that he was asked to determine the postmortem interval ("PMI") for the victims, Samantha and Adam Chrismer. He said that a PMI was the length of time a person had been dead. He said that he had written proposals for the National Institute for Justice to try and refine and develop several new methods of performing PMI determinations.

Dr. Vass explained that, in Petitioner's case, he used his tissue-based PMI method because it was best suited to an early PMI, which was known to have existed in this case because the victims were last seen on October 4, 2002, and their bodies were discovered on October 17, 2002. He explained that the tissue-based PMI method used biomarkers in organ tissues to determine PMI. Dr. Vass stated that the soft tissue of the human body is made up of four main categories: proteins, nucleic acids, carbohydrates which supply saccharides, and lipids. He explained that, as a body decomposes, it goes through the autolytic process, which is a process of self-digestion. He said that, when a body becomes deprived of oxygen,

> you get a buildup of carbon dioxide. And that causes changes in an intracellular basis where the cell begins digesting itself from the inside-out.
>
> As it does that, the complex structures—carbohydrates, lipids—break down into precursors or building block structures. An example is amino acids are the building blocks of protein.

He testified he had proposed that these building blocks could be used in estimating PMI.

Dr. Vass stated that this method for determining PMI was scientifically tested prior to being applied to Petitioner's case and that this testing was detailed in a published paper he had written for the Journal of Forensic Sciences in 2002. He testified that his research went through a peer review process before it was published. Dr. Vass could not say how many times he had used the tissue-based analysis from 2002 to 2004, and he was unaware if other researchers had done their own testing or research into the method. He testified that, while he had used the tissue-based method in other cases, Petitioner's case was the only time he had to testify. He could not recall if he spoke with any attorneys before he testified and was unsure if anyone asked him about validation studies or error rates.

Dr. Vass testified that, in Petitioner's case, he received liver and kidney samples from Dr. Stephens after she had completed the victims' autopsies. He explained that he used liver and kidney samples because they were the only organs that were "sufficiently intact" for collection. Dr. Vass agreed that he had depended on Dr. Stephens and her staff to properly handle and store the samples from the victims. He said that, if the samples had been improperly stored and he had been aware of it, he could have taken that into account

in determining the PMI. He indicated that, if the samples had been improperly stored and he had not been aware, it could have affected the reliability of his results because the samples could have continued to decompose if not properly handled.

Dr. Vass testified that, after he received the victims' samples, he processed them as soon as humanly possible, so the samples would not change. He said that, in processing the samples, they are ground in a tissue grinder and then the samples are derivatized, which he described as "a chemical process which attaches a moiety onto the byproducts which allows them to become more volatile, allows them a thermal stability." A mass spectral profile of the material is developed, and it is used with a database to determine which compounds are present. Dr. Vass stated this data then allows for a determination of PMI.

Dr. Vass explained that "time since death" is based upon "accumulated degree days," which is "an accumulation of the average daily temperature over time at Celsius." He said that, in Petitioner's case, he looked at "cumulative degree hours" rather than days. He stated, "[W]e're looking at a 12-hour time cycle in which changes are monitored[.]" Dr. Vass agreed that temperature matters in the determinations, so it is important to look at where the samples have been located. He testified that for temperature he used the National Weather Service station data "corrected for the . . . death scene environment[.]" He said that the temperature is probably the most important parameter.

Dr. Vass stated that he had obtained the maximum temperatures from the storage facility for October l-17, 2002, temperature information for the Tri Cities on a variety of days in order to develop a correction factor, and the temperature from the morgue for October 18-29, 2002. He recalled that the victims' bodies were found in Rubbermaid containers with fabric wrapped around the bodies. Dr. Vass agreed that investigators did not know exactly how many days the victims' bodies were in the bins or in the storage unit, and they did not know if they had been in air-conditioned rooms prior to being placed in the storage unit. He agreed that, if they had been in air conditioning, this could have impacted the temperature data and results. He explained, however, that this was why his results in the case were "estimates."

Dr. Vass testified that his testing showed different PMIs for Samantha and Adam Chrismer; he postulated that the difference was because the victims were killed at different time periods. He stated that he did not believe the samples were simply stored differently because the kidney samples from both victims provided the same results, but the liver results were different. Dr. Vass explained that the liver was more sensitive for very early types of decomposition because of all the enzymatic activity in the liver. He testified that, if there had been any issue with the samples, he would have noted it in his report. He stated that his tissue-based method of determining PMI was still "good science."

- 51 -

Dr. Amy Mundorff testified she has a PhD in anthropology and is currently employed at the University of Tennessee at Knoxville as an associate professor. She said that she also does research there and that she has been in the position since 2010. Dr. Mundorff testified that, from 1999 to 2004, she had been a forensic anthropologist for the City of New York's Office of the Chief Medical Examiner and that she had managed the mortuary from the World Trade Center disaster as part of her work there. She also agreed that she has been published extensively, that she has testified in state and federal courts in other cases, and that her work has been well-received in her field. Dr. Mundorff testified that she had been hired by Petitioner to review Dr. Vass's work. She indicated that, in preparation for her testimony, she had reviewed Dr. Vass's report and his trial testimony, as well as some photographs and evidence collected by investigators.

Dr. Mundorff explained that forensic anthropology was "the application of physical anthropological techniques to any case that pertains to the law." She testified that she was familiar with the concept of postmortem interval or PMI, which she described as "the time between when somebody died and [when] they've been found." Dr. Mundorff explained that PMI was difficult to calculate. Dr. Mundorff testified that there are commonly accepted methods of determining PMI and identifying a range for time of death. She explained that the commonly accepted methods for calculating PMI were different from the method relied upon by Dr. Vass. She testified that she was not aware of anyone else in the field of forensic anthropology utilizing the method that Dr. Vass used in Petitioner's case.

Dr. Mundorff stated that she was familiar with the study done by Dr. Vass and opined that it did not comport with the scientific method. She explained that Dr. Vass made no hypotheses at the start of his study; she said that "there was nothing that they were trying to disprove, which is how the scientific method works." She stated that Dr. Vass's study "was really just to see if they could get results that might correlate[,]" but she noted that correlation "doesn't always mean causality." Additionally, Dr. Mundorff noted that, in initial studies, generally variables should be limited. She explained that Dr. Vass's study had a multitude of variables relating to the cadaver and that, as such, the subjects of Dr. Vass's study were not really comparable to each other.

Dr. Mundorff explained that, when an individual decomposes, the body is colonized by insects, speeding up decomposition. She said that natural orifices, such as the eyes, nose, mouth, and ears, are colonized first and that the more openings there are in the body, the faster a body will decompose. Dr. Mundorff testified that, in his study, Dr. Vass made incisions throughout the bodies of the cadavers and then covered the incisions with duct tape in-between samplings. She noted, however, that he did not first determine whether the duct tape worked to seal out bacteria and other types of organisms that would also impact decomposition. She opined that this was a problem with the research.

She stated that Dr. Vass's research had not been adequately tested for validity. She further stated that, although Dr. Vass's study had been published and peer reviewed, this was not the same as being "generally accepted." Dr. Mundorff testified that Dr. Vass's study did not have an error rate, which meant that there was no understanding of the weight of the evidence or the accuracy of his conclusions. She testified that the method developed by Dr. Vass was not generally accepted in her field.

Dr. Mundorff testified that, when the readings from Adam's two organs did not match and could not be cross-matched, it should have been an indicator to Dr. Vass that his method did not work. She stated that, to address this problem, Dr. Vass came up with a new way to calculate the PMI, and that it was inappropriate to change the methodology to get the desired results. Additionally, Dr. Mundorff explained the importance of an accurate temperature history and maintained that it required knowing where the bodies were located and for how long. She said that such data cannot be "made up[.]"

Dr. Mundorff further explained that it mattered if a body was intact or dismembered as it related to the speed of decomposition; she said that the more openings on a body, the faster it will decompose. Moreover, whether a body was in a container and whether it was wrapped in layers of fabric would affect the temperature of the body and the rate of its decomposition. She agreed that, if the samples received by Dr. Vass from the morgue were not properly stored, then this would also impact the results. She stated that it did not appear that Dr. Vass had considered temperature data from inside the Rubbermaid storage bin as it sat inside the storage unit. Dr. Mundorff testified that there were multiple variables not considered by Dr. Vass and opined that the methods he used were not scientifically sound; therefore, his conclusions were not scientifically sound.

When asked how she would have determined the PMI, Dr. Mundorff stated that it was a difficult question because of the way bodies decompose. She stated that, if it is within hours to three days after death, medical examiners usually use algor mortis, rigor mortis, and liver mortis—measuring drops in temperature, stiffening, and pooling of blood. She explained that the next method used to estimate PMI is entomology, which relies on the presence of insects on the body and their stage of development. She stated that the medical examiner might next look to what she called "total body score," which relies on observing the different levels of decomposition from the limbs separately, the torso, and the skull; she said that this method looks at skin slippage, changes in color, and whether the skeleton is showing or not. She explained the method used would be dependent upon context.

Dr. Mundorff testified that, in Petitioner's case, even if the victims were killed at the same time, their decomposition rates would have been different because of Adam's dismemberment. She said that she could not speculate on PMI in this case because there

were too many variables for which she could not account. She testified that, based upon the known facts in this case, it was not possible to state with scientific certainty the victims' PMI or if they were killed on different days.

On cross-examination, Dr. Mundorff stated that she disagreed with Dr. Vass's methodology and his conclusions. She agreed that, assuming the factual witnesses at trial were correct that the victims were last seen alive on October 4th, she had no evidence to suggest the victims were dead prior to that date. She also agreed there was no evidence that the victims were alive as late as October 16, 2002, when investigators located them in the storage unit. She stated that she had no opinion as to whether the victims could have been alive past October 8, 2002. She agreed that the evidence demonstrated the victims had been dead for at least a few days when they were discovered because "[t]here was skin slippage and . . . evidence of colonization[.]"

Dr. Charity Owings testified that she was a forensic entomologist employed as a post-doctoral fellow at the Forensic Anthropology Center at the University of Tennessee in Knoxville. She stated that she had published fourteen peer-reviewed papers, including papers on "forensically important arthropods." She explained that forensic entomology is the "application of arthropods or insects to any legal investigation" and is often associated with death, abuse, and neglect investigations in criminal cases. She agreed that entomology is a scientific field that utilizes the scientific method and that failure to follow the scientific method probably leads to "erroneous conclusions."

Dr. Owings testified that Petitioner's post-conviction counsel contacted her to review some testimony and entomological reports from Petitioner's trial. She said that, in preparation for her testimony, she reviewed Dr. Erin Watson-Horzelski's August 2004 report, curriculum vitae, and trial testimony, and the trial testimony of Dr. Neal Haskell. She said that she had also reviewed autopsy reports and photographs, as well as photos of the crime scene.

Dr. Owings noted that Dr. Watson-Horzelski made a PMI estimation using insect larvae and insect pupae collected from the victims. Dr. Owings explained that the first step after receiving the samples was to identify the species of the sample, which Dr. Watson-Horzelski did "as best she could" but was only able to "get a species level identification for a portion of . . . those insects." Dr. Owings testified that, after Dr. Watson- Horzelski identified the species, Dr. Watson-Horzelski needed to estimate the age of the "immature" or non-adult insect evidence, which involved determining whether they were larvae or pupae. She explained how blow flies tend to show up after death and lay eggs, which then hatch into larvae; the larvae then go through their life cycle and continue to grow on the body. She explained how determining the growth rate of those insects allows for an estimation of how old those insects are, which allows for a minimum determination of how

- 54 -

long a person has been dead. She testified that, to determine the age of the insects, Dr. Watson-Horzelski needed to know the temperature of the discovery site for the period of time before the victims' bodies were discovered. Dr. Owings testified that this was "never a perfect estimation." She explained the accepted method to do this was to gather local weather data from a weather station closest to the discovery site.

Dr. Owings stated that experts should next look to peer-reviewed literature of a growth study related to the specific species in the case at specific temperatures, which provides data sets upon which to rely. She explained further that, the more common the species, the greater the number of data sets to choose from; therefore, an expert would want to choose a study performed at a temperature as close as possible to what the insects experienced and as close geographically as possible to the discovery site. Lastly, she indicated an expert should choose a quality study performed with greater rigor and design in the experiments.

Dr. Owings testified that this generally had been the process Dr. Watson-Horzelski used in making her age estimations in this case; she stated, however, that she had several concerns with the specific processes used by Dr. Watson-Horzelski. She noted that Dr. Watson-Horzelski had identified and used several blowfly species for some of her estimations; however, she noted that Dr. Watson-Horzelski had also used other flies from the samples that Dr. Watson-Horzelski had not been able to "identify them down to species[.]" Dr. Owings testified that she did not have a problem with Dr. Watson-Horzelski's not being able to identify the species of the specimens, but her issue was that Dr. Watson-Horzelski still used them in her estimations by choosing a data set and applying it to the unknown species. Dr. Owings indicated this is not an accepted method in the field because fly development is "very species specific."

Dr. Owings also testified that Dr. Watson-Horzelski had obtained weather data from the nearest weather station, as was standard practice, but that Dr. Watson-Horzelski then applied a conversion factor to "somehow" convert the data to account for the storage facility temperatures. She noted that Dr. Watson-Horzelski provided no information in her report as to what conversion factor she used or what study she relied upon in making the conversions. Dr. Owings testified that Dr. Watson-Horzelski had received temperature data from inside the storage unit, which an investigator had collected over several days in January of 2004; Dr. Owings noted that these temperatures were from "a different season and a different year" than from when the bodies were discovered and that there was no precedent for the conversions made by Dr. Watson-Horzelski to account for the discrepancy.

Dr. Owings testified that she had concerns about the published developmental data sets Dr. Watson-Horzelski used for her estimations because the data sets were outdated.

She testified that one of the studies relied upon by Dr. Watson-Horzelski was known in the field to be erroneous. Dr. Owings explained that the outdated study also relied upon warmer temperatures than that of the body discovery site in this case and that this was important because the developmental rate of flies was "very dependent" on temperature.

The last concern Dr. Owings discussed related to the temperature was the way Dr. Watson-Horzelski had done the estimation. She explained how, in applying the data sets, Dr. Watson-Horzelski had only used the minimum developmental durations for the larvae in the studies. Dr. Owings said that this was not the standard protocol used in forensic entomology. She explained that, when sampling a maggot from a crime scene, its age is unknown just by looking at it; she said that it is possible to tell the developmental stage under a microscope but not how many hours old it is. Dr. Owings indicated that the point of the developmental studies was to produce a range of possible developmental times at certain temperatures; thus, when making an estimation, the full range of possibilities must be provided and required the use of the minimum and maximum developmental times to make an estimation. Dr. Owings opined that, by only using the minimum developmental times, Dr. Watson-Horzelski was biasing her estimation to only the "fastest developing maggots." Dr. Owings testified that there was no indication in Dr. Watson-Horzelski's report as to why Dr. Watson-Horzelski calculated her estimations in this manner. Dr. Owings opined, based upon her concerns, that Dr. Watson-Horzelski's conclusions were untrustworthy and "likely . . . erroneous."

Next, Dr. Owings discussed Dr. Watson-Horzelski's report as it related to the home of Betty Willis on Brentwood Drive. Dr. Owings noted that, during Dr. Watson-Horzelski's testimony, Dr. Watson-Horzelski linked evidence in photographs of what she described as blowfly larvae and pupae at the residence with evidence at the storage facility. Dr. Owings stated that the photographs were low resolution and unclear and that she did not know any entomologist who could have identified the "putative fly larvae" from the photographs.

Dr. Owings testified that she also reviewed materials related to Dr. Haskell's trial testimony. She noted that Dr. Haskell had also disagreed with Dr. Watson-Horzelski's report in many of the same ways she had disagreed with it. She stated, however, that some of the points made by Dr. Haskell in his testimony "were actually erroneous." Dr. Owings said that it appeared Dr. Haskell had concerns about a data point in the study relied upon by Dr. Watson-Horzelski but that Dr. Haskell misread the data point. She also noted that Dr. Haskell had concerns about how Dr. Watson-Horzelski performed her calculations because Dr. Watson-Horzelski did not include a base temperature; however, Dr. Owings said that Dr. Watson-Horzelski's report did include the base temperature. Dr. Owings opined that Dr. Haskell had probably needed more than one month to properly review all of the material in the case before testifying at Petitioner's trial. However, she found Dr.

Haskell's methods and conclusions to be partially scientifically sound in that he picked up on some of the errors in Dr. Watson-Horzelski's work, but he also made the errors discussed.

Dr. Owings testified that she reached her conclusions in Petitioner's case by relying upon the standard, accepted methods in the field of forensic entomology. She stated that she had relied upon Dr. Watson-Horzelski's insect identification, excluding the species Dr. Watson-Horzelski had been unable to identify, but that she had used data sets she considered more reliable. Dr. Owings said that she had then obtained the local average temperature for the time frame from when the victims were last seen to when they were discovered, which was around 16.7 degrees Celsius. She said that she then used developmental data sets for 15 degrees Celsius and for 20 degrees Celsius; she said that she did not use the temperature data from the storage unit used by Dr. Watson-Horzelski because Dr. Owings "didn't even know what that was." Dr. Owings said that she also used "the full developmental range; whereas [Dr. Watson-Horzelski] had just used the minimum range." She explained that everything she used in making her calculations would have been available to Dr. Watson-Horzelski in 2004.

Dr. Owings testified that her conclusions as to when the victims may have died were different than Dr. Watson-Horzelski's conclusions. She testified that the victims could have been colonized several days earlier than the dates Dr. Watson-Horzelski submitted in her report. Dr. Owings testified that the time of colonization can be used to infer a minimum PMI. She testified that she could not say when the victims died but only when the insects were present. She further stated that the ranges she developed overlapped as to the two victims.

On cross-examination, Dr. Owings agreed that Dr. Haskell testified at trial to her same concerns relating to the temperatures used by Dr. Watson-Horzelski; the correlation or correction factor applied by Dr. Watson-Horzelski in calculating the temperature in the storage unit; and Dr. Watson-Horzelski's use of a species that Dr. Watson-Horzelski had not fully identified. She also agreed that Dr. Haskell had testified that it could not be determined if the victims were or were not killed on different days based upon the available evidence.

Dr. Owings agreed that her report indicated the latest day Adam's body was colonized was October 4, 2002, which she opined meant that there was very little delay in insect access to his body based upon the last known sighting of him alive on the same date. She testified that she did not make any guesses concerning the location of the bodies following death other than where they were discovered. She stated that the weather data she used was for the entire local area but that she had no specific information concerning temperatures inside the storage unit. Dr. Owings agreed that the primary issue both she

and Dr. Haskell had with Dr. Watson-Horzelski's work was Dr. Watson-Horzelski's use of temperatures. She agreed with Dr. Haskell's testimony that there was no way to determine through entomology if the victims in this case were killed in the same place and at the same time. She agreed that the samples from Adam's body included both pupae and pre-pupae, which are larvae about to become pupae, and that samples collected from Samantha's body were larvae and some pre-pupae. She noted that the pupae were the final stage before becoming an adult insect. When asked if this meant Samantha's body was colonized later than Adam's, she stated that her estimates for the two had "overlap," which meant they could have been colonized at the same time. Dr. Owings agreed that, for her own calculations, she assumed the bodies were at 16.7 degrees Celsius the entire time of colonization; she agreed that, if the temperatures she used were incorrect, then her estimates for the time of colonization would be incorrect.

Dr. Owings disagreed with Dr. Haskell's trial testimony that there was no way to determine a time of colonization in this case because there was no way to know when and where the victims' bodies were located after death. She stated, "So I am using the evidence I have. I'm using the known variables in that scenario to draw my conclusions. And, yes, we do have to make assumptions about temperature and things because there's no way for us to know the true temperature that those maggots are experiencing." She agreed that the calculation in her report showing that the last possible time of colonization for Adam on October 4th was based upon a data set for 20 degrees Celsius. She also agreed that her calculation for Samantha's last time of colonization had been October 7th. Dr. Owings admitted that she had not been aware the storage unit was not rented until October 10th. She admitted that she did not consider if the murders had occurred at Brentwood Drive because she had no entomological evidence from that location. She agreed that the ambient temperature inside a home could be much different than the average temperature at the local weather station, and she agreed that she did not know the temperature inside the home on Brentwood Drive. Dr. Owings testified that she would assume the temperature inside the storage bins where the bodies were wrapped in fabric would have been warmer than the ambient temperature outside the storage unit, but she stated that she did not have a way to convert those temperatures without precise data from inside a bin under the same conditions. Despite all the variables that she could not account for, Dr. Owings thought that it was possible to come up with an estimated time of colonization.

Dr. Owings agreed that, using the 15 degree Celsius data set, the entire range of time of colonization that she calculated for Adam fell "before the last known alive date" of October 4th. She said that the date in her report of October 4th for the colonization of Adam was based on a 20 degree Celsius data set.

On redirect, she agreed that, in coming to her conclusions, she used the evidence available to her, which was the same evidence available to Dr. Watson-Horzelski. Dr.

Owings stated that, "if the evidence is bad, then the results will be bad." On re-cross, she agreed that her calculations indicated neither of the victims had a time of colonization later than October 7th. She agreed that it was likely the victims died at least three days prior to being moved to the storage unit, which was rented on October 10th.

Wade Davies ("Mr. Davies") testified that he had been practicing criminal defense law in Knoxville for thirty years. He testified concerning his considerable experience in trial and appellate work in criminal cases both in state and federal courts and his affiliations with various groups and organizations, including the American College of Trial Lawyers. He noted that he had served on the BPR for two terms and had taught appellate clinic classes at the University of Tennessee College of Law. He agreed that he had previous experience working on capital post-conviction cases.

Mr. Davies testified that, in preparation for his testimony, he reviewed records relating to the various hearings when attorneys withdrew or were removed, the interlocutory appeal on the issue of Petitioner's self-representation, Petitioner's pro se application for the interlocutory appeal, the brief filed by Counsel Gulley, correspondence between Petitioner and Counsel Gulley, the rules of professional conduct, AFD Carter's deposition, portions of the trial record, and the reports from the State's two experts.

Regarding expert reports, Mr. Davies opined that defense attorneys have an obligation to understand any expert report and that this generally requires consulting their own expert in the field, regardless of whether the defense attorney believes the issue is material or not. He noted that, in capital cases, courts will typically authorize funds for defense experts. He testified that, if an expert consulted by the defense prepares a report that is not helpful to the defense, the report is privileged; it remains part of the file, and the defense has no duty to disclose that information to the State.

Mr. Davies testified that the American Bar Association standards for appellate representation state that appellate defense counsel should consult with the client about the appeal and seek to meet with the client unless impractical. He testified:

> I don't see how it could be appropriate for counsel never to consult with the client about what the client's objectives are in the representation. I don't . . . see any way that you can fulfill your duty to the client without . . . knowing what it is the client is trying to achieve, and whether there is something that the client wants in particular from the representation.

Mr. Davies opined that Counsel Gulley should have either met with Petitioner in person or communicated with him over the phone. Mr. Davies explained that Petitioner's pro se application for interlocutory appeal demonstrated there were specific things that

were important to Petitioner that Petitioner was seeking to bring out in the appeal. Mr. Davies noted, specifically, that Petitioner did not believe the record had been adequately developed on the issue of why he had disagreements with his attorneys and that the disagreements were not manipulations of the system. Mr. Davies further noted that one of the issues was how counsel had not called AFD Carter as a witness for the suppression hearing. He testified that, in his pro se application for interlocutory appeal, Petitioner also stated that "there was a lot more [Petitioner] could have prove[n] but [he] was frustrated and ha[d] no training to question witnesses and present evidence in court." Mr. Davies continued:

> And I think that's really important because when you go back . . . and look at . . . the transcript of that hearing from 2008, even though he still technically had counsel, [Petitioner] was forced to litigate that issue on his own even to the point of being told that he had to ask himself questions and then answer them. So . . . he's setting out here that there was a lot more that he wanted to put on the record.

While Mr. Davies agreed that an attorney is generally constrained by the record on appeal, he said that it appeared Petitioner wanted to argue that he was not provided a fair hearing on the issue of removal of counsel. Mr. Davies said that Counsel Gulley could have filed a motion to stay the proceedings and remand the case for a further hearing or, as part of his appellate brief, Counsel Gulley could have asked that relief be a remand for further fact-finding with Petitioner being represented by counsel for that purpose. He noted, however, that Counsel Gulley did not seek any type of remand in the appellate brief. Mr. Davies indicated that the legal arguments in Counsel Gulley's brief were correct, but he said that Counsel Gulley merely accepted the statement of facts from the trial court rather than arguing the facts from the hearings.

Mr. Davies opined that Counsel Gulley's representation was deficient primarily because he did not seek to find out the client's objectives in the appeal. He stated:

> That is one of the most important parts of practicing law. The client sets the objectives. The attorney has got to consult with the client about the means by which you try to satisfy those objections. There's also what I reviewed is in a lot of the correspondence that [Petitioner] had with [Counsel] Gulley, he also did specifically say . . . things like the record may contain some of the evidence of these problems. He's talking about problems with his counsel. But other evidence may not be on the record and would have to be submitted and explained in order to prevail, and this should be done.

Mr. Davies testified that Counsel Gulley should have retained his file; he said that a death penalty case file should be retained forever. He noted that there was a 2015 BPR opinion that set out a general rule of keeping a file for five years with certain exceptions, which he believed included a capital case.

On cross-examination, Mr. Davies stated that he had never met with Petitioner to ask what his objectives in the interlocutory appeal had been and what Petitioner would have told Counsel Gulley had Counsel Gulley met with him. Mr. Davies indicated that part of the problem had been Petitioner's use of the term "ineffective assistance of counsel" in his pro se application for interlocutory appeal and in his letters to Counsel Gulley when discussing the issues he wanted to raise on interlocutory appeal. Mr. Davies opined:

> But I think . . . what that really means is that the things that [Petitioner] was complaining about he believed to be very legitimate issues, and therefore he wasn't trying to forfeit his right to counsel or waive it, but to bring to the court's attention that there are things that he really thought should be done[.]

He agreed that, to some extent, this would be challenging the effectiveness of counsel. He opined that Petitioner did not have a sufficient opportunity to litigate the issue in the April 2008 hearing because he had to "basically represent himself" on the issue and was not prepared to do so, despite having filed a motion himself for the appointment of new counsel and to relieve current counsel.

Mr. Davies stated that he did not think AFD Carter's testimony would have made any difference in the interlocutory appeal but stated that it would have gone to the idea of whether Petitioner was "manipulating the system in an attempt to prevent his trial from going forward[.]" Mr. Davies testified that he could not say Petitioner would have won on the issues he wanted to raise but that it showed legitimate concerns about his case. He agreed that an appellate attorney does not have to raise every issue a client wants raised on appeal but stated, "I think you always have to try to find out what it is they want and talk to them about it." Mr. Davies agreed that ultimately it is the attorney who must determine what issues to raise on appeal.

Mr. Davies agreed that the appellate court had access to the record and would have reviewed the transcripts on its own. He admitted that he was unaware of what conflict existed for Counsel Bowman; he stated that he had not asked current counsel or Petitioner what that conflict was. Mr. Davies agreed there are circumstances where an attorney cannot lay out the reason for the withdrawal because it will harm the client. He stated that counsel has "a duty to try to withdraw without harming the client, which normally means trying to make sure that they get another lawyer." When asked what specific witnesses he would like to have seen called if the case had been remanded to more fully develop the

record for the interlocutory appeal, Mr. Davies said that he did not know the record thoroughly enough to list out all of the proof that should have been put on at remand. He admitted that he had not read the transcript of when the trial court had allowed Petitioner to reargue and present witnesses on the issue of suppression.

The post-conviction court entered a written order denying relief on October 3, 2023. This timely appeal follows.

## II. Analysis

To prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

Generally, post-conviction relief is available when a sentence is void or voidable because of an abridgment of a state or federal constitutional right. Tenn. Code Ann. § 40-30-103. However, waived or previously determined claims are procedurally barred, Tenn. Code Ann. § 40-30-106(f), and courts may not apply plain-error review to post-conviction claims that have been waived or previously determined. *Grindstaff v. State*, 297 S.W.3d 208, 219 (Tenn. 2009).

A claim is waived if the petitioner "failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g). Claims are not waived if they are based on a state or federal constitutional right that was not recognized at the time of trial or if failure to present the claim was "the result of state action in violation of the federal or state constitution." Tenn. Code Ann. § 40-30-106(g).

A claim is previously determined "if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-106(h). "A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and

otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." Tenn. Code Ann. § 40-30-106(h).

## A. Ineffective Assistance of Counsel

Petitioner contends that he was denied the effective assistance of counsel through "a series of failures" on the part of his appointed pretrial counsel. Specifically, he maintains that pretrial counsel failed to: (1) move to suppress the search of Betty Willis's house; (2) call AFD Carter to testify at a hearing on the issue of the suppression of Petitioner's statements; (3) consult with and seek funding for defense experts to better understand and defend against the State's scientific evidence; (4) raise a challenge to venue; and (5) properly withdraw from Petitioner's case.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad*, 938 S.W.2d at 370. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter*, 126 S.W.3d at 886). Review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad*, 938 S.W.2d at 369. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

If a petitioner's claim is based on trial counsel's failure to seek suppression of certain evidence, the petitioner must demonstrate (1) that a suppression motion would have been meritorious; (2) that the failure to file the motion was objectively unreasonable; and (3) that without the unreasonable failure to seek suppression there is a reasonable probability that the verdict would have been different. *Phillips v. State*, 647 S.W.3d 389, 404 (Tenn. 2022). Essentially, to prevail on an ineffectiveness claim premised on a failure to seek suppression of certain evidence, a petitioner must conduct the equivalent of a suppression hearing during the post-conviction hearing. *See id.*; *Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sep. 12, 2011), *no perm. app. filed*.

### 1. Failure to seek suppression of evidence from the search of Betty Willis's house

Petitioner contends that he was denied the effective assistance of counsel based upon pretrial counsel's failure to file a motion to suppress the search of Betty Willis's house, noting that the State presented evidence at trial that connected the house to the storage unit where the victims' bodies were discovered. He argues that counsel's strategic decision not to pursue the motion to suppress because the defense did not want to tie Petitioner to the house was "not ground[ed] in the law." The State responds that counsel reasonably declined to seek suppression of evidence from Betty Willis's house and that he has not established prejudice.

In denying relief, the post-conviction court accredited the testimony of Counsel Scott that the decision not to seek suppression of the evidence found at Betty Willis's house was a strategic one, noting that Counsel Scott testified that he and Counsel Smith did not want to try to establish standing because they did not want to associate Petitioner with the house. The court determined that this decision was reasonable under the circumstances and that Petitioner failed to establish prejudice.

The record does not preponderate against the post-conviction court's findings, and we agree that Petitioner failed to establish deficient performance and prejudice under *Strickland*. At the post-conviction hearing, Counsel Scott was asked about his and Counsel Smith's decision not to file a motion to suppress the evidence found at Betty Willis's house. Counsel Scott testified that he advised Petitioner against such a motion because he believed "the best way to try the case was to pin it on [Petitioner's] mother." Counsel Scott explained that he and Counsel Smith were concerned that the proof required to establish standing to challenge the search would tie Petitioner to his mother's house and hamper the strategy of pinning the murders on Betty Willis. Counsel Scott also stated that he did not think the substantive argument for suppression was strong; he indicated that, if he had thought suppression was a "slam dunk[,]" then he probably would have pursued it despite the standing issue. He stated, however, that they did not think the suppression issue was a winning issue, so they made a strategic decision not to file a suppression motion. Petitioner has not shown that counsels' performance was deficient. *Strickland*, 466 U.S. at 687.

As noted by the State, Petitioner did not conduct the equivalent of a suppression hearing at the post-conviction hearing and, thus, failed to demonstrate that a suppression motion would have succeeded. *See Phillips*, 647 S.W.3d at 404. Additionally, the issue of the suppression of evidence from Betty Willis's house was reviewed for plain error on direct appeal, and the Tennessee Supreme Court determined that suppression of this evidence was not warranted. *See Willis*, 496 S.W.3d at 720-23. "[A]ny claims of ineffective assistance of counsel in the post-conviction petition that were identical to Petitioner's claims on direct appeal and [were] determined . . . not to rise to the level of plain error also [fail] to establish prejudice in the context of a post-conviction proceeding." *Owens v. State*, No. M2009-00558-CCA-R3-PC, 2010 WL 1462529, at *6 (Tenn. Crim. App. Apr. 13, 2010), *perm. app. denied* (Tenn. Sept. 22, 2010); *see also Onyiego v. State*, No. W2022-00629-CCA-R3-PC, 2023 WL 2326336, at *21 (Tenn. Crim. App. Mar. 2, 2023), *no perm. app. filed*. Given that Petitioner failed to demonstrate plain error on direct appeal, he also has failed to demonstrate a reasonable probability that the outcome of the proceedings would have been different. *Strickland*, 466 U.S. at 694.

### 2. Failure to call AFD Carter as a witness at suppression hearing

Petitioner maintains that pretrial counsel rendered ineffective assistance based upon the failure to call AFD Carter to testify at a motion to suppress Petitioner's inculpatory statements made on October 16, 2002. The State responds that Petitioner failed to establish the prejudice needed to succeed on this claim.

In ruling on this issue, the post-conviction court concluded that the "trial and appellate court's rulings concerning the suppression issue dictate that the testimony of

[AFD] Carter would not have affected the results of the suppression issue" and that, therefore, Petitioner failed to establish prejudice. We agree.

On direct appeal, the Tennessee Supreme Court considered whether Petitioner's Fifth or Sixth Amendment rights were violated when he made incriminating statements to Wilda Willis on October 15 and 16, 2002. It held that the fact Petitioner was represented by counsel on federal charges in New York was not relevant to his claims under the Fifth and Sixth Amendment. Specifically, our supreme court held that, under a "misplaced trust analysis," Petitioner's conversations with Wilda were voluntary and, therefore, Petitioner's Fifth Amendment rights against compelled self-incrimination and right to counsel were not violated. *Willis*, 493 S.W.3d at 699-707.

As to Petitioner's Sixth Amendment right to counsel argument, our supreme court stated:

> As noted by both of the lower courts, the Sixth Amendment right to counsel is "offense specific." Statements obtained regarding an offense for which adversary judicial proceedings have not begun are admissible, even if they were deliberately elicited during an investigation of a separate offense for which there was a right to counsel. Assertion of the right to counsel for an indicted offense does not serve to invoke the right for all future prosecutions. The Sixth Amendment right to counsel attaches only to offenses that, even if not formally charged, would be considered the "same offense" under the *Blockburger* test. *Blockburger* defines offenses as the "same" only where neither statute requires proof of a fact that the other does not.
>
> In this case, the pending federal charge for violating the conditions of release in New York and the Tennessee murder charges related to the victims in this case were clearly not the "same offense" for purposes of attachment of the Sixth Amendment right to counsel. Therefore, when [Petitioner] made his statements to Wilda on October 15 and 16, 2002, he had not been charged with the murders and the Sixth Amendment right to counsel had not attached as to those charges.

*Id*. at 707 (citations omitted). Thus, even if counsel had subpoenaed AFD Carter to testify at a suppression hearing, his testimony about his representation of Petitioner on the federal charges and his invocation of Petitioner's rights in that case would not have affected the results of the suppression issue in Petitioner's state murder case. Petitioner has failed to establish prejudice under *Strickland*, and he is not entitled to relief.

- 66 -

### 3. Failure to consult with and seek funding for defense experts

Petitioner asserts that pretrial counsel rendered ineffective assistance by failing to consult with and seek funding for defense experts "to better understand and defend against the State's scientific evidence" provided by Dr. Arpad Vass and Dr. Erin Watson-Horzelski as to the time of death of the victims. Petitioner argues that because the victims were last seen in Georgia prior to their bodies being discovered in Tennessee, their time and place of death was "a critical issue not just for [Petitioner's] innocence, but also as to whether [Petitioner's] charges were brought in the correct venue." Petitioner asserts that the testimony of Dr. Mundorff and Dr. Owings demonstrated that, had pretrial counsel sought funding for and utilized expert witnesses, the trial court likely would have excluded the testimony of Dr. Vass entirely and that pretrial counsel would have understood there were "significant problems" with Dr. Watson-Horzelski's report and proposed testimony. The State responds that Petitioner failed to establish deficient performance and prejudice.

In denying this claim, the post-conviction court made the following findings:

[Counsel] Smith testified he recalled discussions between himself, [Counsel] Scott, and [P]etitioner in which they discussed potential scientific experts, but they ultimately decided the scientific evidence was not important based upon their theory of defense that [P]etitioner's mother was guilty. [Counsel] Lawson consulted a doctor concerning the autopsies and police reports as was evidenced by his fee claim, and [P]etitioner employed his own time of death expert.

. . . .

During his trial, Petitioner called Dr. Haskell, an expert in the field of entomology, to rebut the State's experts, Dr. Watson[-Horzelski] and Dr. Vass, on the issue of time of death. Dr. Haskell testified concerning major flaws in the work of Dr. Watson[-Horzelski], and then also explained there were concerns with the work of Dr. Vass concerning time of death as well, due to his reliance on incorrect temperature readings.

. . . .

[At the post-conviction hearing,] Dr. Owings thoroughly testified concerning Dr. Watson[-Horzelski's] conclusions and opined, based upon all of her concerns, that Dr. Watson[-Horzelski's] conclusions could not be trusted and were likely erroneous. Dr. Owings noted Dr. Haskell had also disagreed with Dr. Watson[-Horzelski's] report in many of the same ways she had disagreed

with it, although there were some differences in their opinions. Dr. Owings testified her conclusions as to when the victims may have died were different than Dr. Watson[-Horzelski's] conclusions. She agreed there were variables concerning temperatures in the storage unit as well as where the bodies were actually stored which could affect the results. She agreed with Dr. Haskell that there was no way to determine, entomologically speaking, if they were killed in the same place and at the same time.

When asked if Samantha was colonized later than Adam, Dr. Owings stated her estimates for the two had overlap which meant they could have been colonized at the same time. She agreed Dr. Haskell had asserted that because there was no way to know when and where the bodies had been that there was no way to determine a time of colonization; however, she disagreed because she opined that all she can do is use the data she has. She admitted she had not been aware the storage unit was not rented until October 10, 2002. Despite all the variables which she could not consider, she still disagreed with Dr. Haskell and thought she could come up with an estimated time of colonization. She agreed her calculations indicated neither Samantha nor Adam had a time of colonization later than October 7th. She also agreed it was likely they were dead for at least three days prior to being moved to the storage unit when it was rented on October 10th.

. . . .

As previously mentioned, counsel made a strategic decision, with the participation of [P]etitioner, not to challenge the expert evidence based upon the theory of defense. In addition, even if this [c]ourt found the actions of counsel here were not reasonable, [P]etitioner has failed to carry his burden of proof regarding prejudice. The experts in this case had some similar and other differing opinions. Petitioner called an expert who challenged the State's expert at trial on many of the same points made by Dr. Owings here. This [c]ourt did not find Dr. Owings' testimony to be particularly credible as to her estimations; this [c]ourt was concerned with how Dr. Owings testified that she just worked with what she had and gave an opinion accordingly. The unknown variables such as the temperatures and the placement of the bodies prior to being placed in the storage unit were important factors which Dr. Haskell pointed out at trial. Both experts found major issues with Dr. Watson[-Horzelski's] findings and testified as such. Furthermore, [P]etitioner himself gave statements which provided the time of death as October 5 and October 6, 2002. The last known sighting of each victim was on October 4, 2002. Based upon all the evidence, this [c]ourt does not find

[P]etitioner has carried his burden of proof regarding prejudice related to Dr. Watson[-Horzelski's] testimony.

As it relates to the claims of failure to investigate the qualifications of Dr. Vass and develop cross-examination of his testimony, as well as employ an expert on behalf of the defense, [P]etitioner presented the testimony of Dr. Mundorff, who has a PhD in anthropology. She testified in detail as to how she disagreed with the methodology of Dr. Vass and his conclusions. She reviewed scene and autopsy photos, but she admitted she did not review the testimony of any fact witnesses from the trial. She could not say if the victims were killed before October 4th as it . . . would only be speculation because she did not know enough information. She agreed that if she assumed factual witnesses were correct that the victims were last seen alive on October 4th, then she had no evidence to suggest the victims were dead prior to that date. She also agreed there was no evidence the victims were alive as late as October 16, 2002, when they were located in the storage unit, because there was evidence of decomposition when located. She had no opinion as to whether the victims could have been alive past October 8, 2002, or about the opinion of Dr. Vass concerning the last date the victims were possibly alive having been October 8, 2002. She also had no opinion about how this may have been consistent with the testimony of the entomologist at trial. She agreed the evidence demonstrated the victims had been dead for at least a few days when they were discovered because there was skin slippage and evidence of colonization. She stated she could not say how long because of all the variables.

As previously stated, [Counsel] Smith testified the defense team made a strategic determination not to focus on the expert evidence. In addition, Dr. Haskell testified at trial there were concerns with the work of Dr. Vass concerning time of death, due to his reliance on incorrect temperature readings. Dr. Owings had these same concerns here. This [c]ourt has discussed other aspects of the issues related to time of death previously, and does not find [P]etitioner has carried his burden of proof to establish either deficiency or prejudice on this issue.

The record does not preponderate against the post-conviction court's factual findings, and we agree that Petitioner failed to carry his burden of proof as to both prongs of the *Strickland* analysis. After discussions with Petitioner, Counsel Smith and Counsel Scott made a strategic decision not to hire experts to explore the victims' time of death because their chosen defense strategy of placing blame on Betty Willis diminished the significance of any expert testimony about time of death. As noted by the State, strategic

choices made after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Additionally, Petitioner retained a forensic entomology expert, Dr. Haskell, who raised many critiques of the State's experts at trial. *See Willis*, 496 S.W.3d at 681-82. Petitioner failed to establish a reasonable probability that, had pretrial counsel retained experts "to better understand and defend against the State's scientific evidence" as to the time of death of the victims, the results of the proceedings would have been different. *See Strickland*, 466 U.S. at 694. He is not entitled to relief.

### 4. Failure to raise a challenge to venue

Petitioner also asserts that pretrial counsel was ineffective in failing to challenge venue. He notes that Dr. Owings testified that, based upon the entomological evidence collected from the victims' bodies, Adam was likely killed on the same day he was seen alive, "which would have been in Georgia." The State responds that counsel reasonably declined to contest venue.

In addressing this issue, the post-conviction court found that counsel who testified at the evidentiary hearing "stated they saw no evidence to support a challenge to venue in Washington County[.]" The court found no deficiency in this evaluation and decision, and the court noted that, when representing himself, Petitioner never filed a motion challenging venue. Regarding the evidence establishing venue, the post-conviction court found, in part:

> [T]here was sufficient evidence of venue in Washington County, Tennessee, at [P]etitioner's trial; while [P]etitioner told authorities he had last seen the victims in Georgia on October 4, 2002, and other witnesses also indicated the victims were last seen in Georgia on this same date, [P]etitioner's own recorded statement of October 16, 2002, to Wilda Willis included admissions that Samantha returned to Johnson City on October 5, 2002, and Adam returned to Johnson City on October 6, 2002. The October 16, 2002, statement also included [P]etitioner's confession that he shot both victims in the head on October 6, 2002, at his mother's residence in Johnson City, Tennessee, located in Washington County. The victims' remains were found in Washington County, Tennessee, starting with Adam's head and hands respectively on October 11 and 12, 2002, in Boone Lake; the remainder of Adam's body and Samantha's entire body were found a few days later in a local storage unit.

The court determined that because the evidence supporting venue was sufficient, Petitioner had not shown prejudice resulting from counsels' failure to file a venue challenge.

The record does not preponderate against the post-conviction court's factual findings. Counsels Bowman, Lawson, Smith, and Scott testified that their review of the record gave them no reason to think that the crimes occurred anywhere other than in Washington County. The evidence establishing venue was sufficient, and we conclude that it was a reasonable decision for counsel not to raise a venue challenge that they believed was unsupported by the record. Moreover, Petitioner fails to identify any prejudice that occurred from counsels' failure to challenge venue pretrial. As noted by the State, venue is typically challenged at trial because it "is a question of fact to be determined by the jury," and may be proven entirely by circumstantial evidence. *State v. Brush*, No. E2022-00379-CCA-R3-CD, 2023 WL 2911139, at *6 (Tenn. Crim. App. Apr. 12, 2023) (citing *State v. Young*, 196 S.W.3d 85, 101-02 (Tenn. 2006)), *perm. app. denied* (Tenn. Aug. 8, 2023). Petitioner had the ability to challenge venue at trial, and he fails to explain how the lack of a pretrial venue challenge resulted in prejudice to the defense. Thus, we agree with the post-conviction court that counsels' decision to not challenge venue pretrial was neither deficient performance nor prejudicial. *See Strickland*, 466 U.S. at 687. Petitioner is not entitled to relief.

### 5. Failure to properly withdraw from representing Petitioner

Petitioner argues that Counsels Lawson, Smith, and Scott rendered ineffective assistance when withdrawing from representing Petitioner. He points to Counsel Lawson's statement during a motion to withdraw hearing that Petitioner was a "prevaricator." He contends that Counsel Smith and Counsel Scott did not take reasonable steps to protect his interests upon their withdrawal, arguing that he was "forced to effectively represent himself at his own hearing to determine whether he would be forced to proceed pro se" and that neither counsel "made any objection or offer to represent him for the purposes of the hearing[,]" thereby abdicating their duty to Petitioner. The State responds that counsel "withdrew competently."

In denying relief, the post-conviction court found, as follows:

At the motion hearing on [Counsel] Lawson's motion to withdraw, [Counsel] Lawson informed the trial court that [P]etitioner had filed a complaint against him with the [BPR] and made the complaint Exhibit 1 to the November 7, 2005, hearing.

Exhibit 2 to the November 7, 2005, motion hearing, was an affidavit by [Counsel] Lawson which stated as follows:

. . . I have diligently attempted to communicate the law and the facts as I have deduced them from the discovery

- 71 -

material I have in my possession. (18 volumes plus case and treatise material gathered by my staff and me.) I have gathered this material from former counsel, the District Attorney, the cases relevant to capital murder, legal treatises on capital cases, cases and materials from a 12 hour death penalty seminar.

I have diligently attempted to communicate the knowledge of a capital murder case to [Petitioner] since my initial interview with him on June 13, 2005. Initially, [Petitioner] listened to counsel but as my representation progressed it became evident that [Petitioner] had his own agenda and would only address those issues which he considered important. After listening to [Petitioner] it became apparent that he would not focus on the facts of the present case but was more interested in presenting his own agenda which due to my attorney/client privilege, I cannot divulge in this Affidavit. Finally on October 11, 2005, I received a complaint against me from the [BPR] which [Petitioner] had told me on September 22, 2005, he had filed. At that time I knew any further communication between [Petitioner] and myself was futile and I could no longer represent him zealously as required by the Professional Rules of Conduct because of my fears that [Petitioner] does not want me to represent him and will not cooperate with me in the preparation of his case.

I believe the attorney/client relationship between [Petitioner] and myself is irretrievably broken because of [Petitioner's] conduct toward me and his filing of the complaint against me with the [BPR] puts [Petitioner] and myself in an adversarial position and I can no longer ethically represent him.

When the trial court asked, [P]etitioner indicated he did not think [Counsel] Lawson was doing his job. Petitioner told the trial court [Counsel] Lawson had informed him in September, when asked, that he had not read the discovery, and he had done nothing toward getting a detective despite needing one. Petitioner stated [Counsel] Lawson had merely put everything on [Counsel] Scott, and there was no communication with [Counsel] Lawson. When the trial court noted prior counsel had indicated part of the problem with an investigator had been [P]etitioner wanted things investigated, such as a civil rights violation that had absolutely nothing to do

with this case, [P]etitioner told the court that prior counsel had not been truthful with the court.

[Counsel] Lawson then responded to [P]etitioner's comments; he stated the comments were not true because he had been in possession of discovery since the beginning of this case and continually received more discovery. He specified he had discovery sessions with [Counsel] Scott where they had gone over transcripts and statements, and "just about everything pertinent to this case." He stated what [P]etitioner was alleging was an "outright lie."

Despite [P]etitioner indicating there was no communication with [Counsel] Lawson, billing records in Exhibit 2 to this hearing indicate [Counsel] Lawson either conferred in person or by phone with [P]etitioner 24 times, excluding in court. In addition, eight of these visits ranged in length from between 1.2 hours to 2.8 hours. Some of these conferences included co-counsel as well.

When the trial court inquired of [Counsel] Scott, he indicated he did not want to be a witness against his client, but he did confirm meetings and conferences with [Counsel] Lawson. He indicated he had received discovery from [Counsel] Bowman, and he was aware [Counsel] Street had provided discovery to [Counsel] Lawson. He also indicated he was not sure if [P]etitioner was aware of the meetings between [Counsel] Lawson and himself.

[Counsel] Lawson then stated he had reviewed most of the discovery, and he had eighteen (18) volumes of discovery in his car in the parking lot; he stated he had done extensive research in the federal and state systems, developing an issue that had not yet been raised, as well as developing issues from the capital case seminar he had previously attended. He indicated he had spent about 70 total hours working on the case since his appointment. He then explained that he had been attempting to provide [P]etitioner with the effective assistance of counsel, but, by filing the complaint, [P]etitioner had made him an adversary in another forum while still representing him in the trial court; it was at this point when [Counsel] Lawson referred to [P]etitioner as a "blatant prevaricator." [Counsel] Lawson then apologized to the court for getting upset and commented that this "is the type of behavior that [Petitioner] persists in. You try to get information out of him you can't get information out of him."

At this point, [P]etitioner interrupted to state he had always been forthcoming with [Counsel] Lawson. [Counsel] Lawson continued briefly with his explanation, and then [Counsel] Scott indicated to the trial court that the attorney client relationship between [P]etitioner and [Counsel] Lawson could not be repaired. The trial court granted the motion to withdraw.

This [c]ourt has reviewed the record on this matter. Petitioner did not testify here; [P]etitioner's allegations concerning [Counsel] Lawson not communicating with him and not working on the case were contrary to the records. The record established the problem between counsel and [P]etitioner without violating confidences. [Counsel] Lawson appears to have been offended by [P]etitioner's statements, but understandably so as he was being accused of unprofessional conduct. However, counsel did feel it necessary to apologize to the court. At the hearing, the trial court granted the motion to withdraw without any great issue and then proceeded to appoint a new lead counsel. Based upon the record as a whole, even if this [c]ourt found [Counsel Lawson's] remarks in court to be inappropriate, this [c]ourt does not find [P]etitioner has carried his burden of proof on the prejudice prong of this issue.

(footnotes omitted).

The post-conviction court's extensive findings regarding Counsel Lawson's withdrawal from Petitioner's case are fully supported by the record. Furthermore, we agree that Petitioner failed to show how Counsel Lawson's statements at the withdrawal hearing resulted in prejudice to the defense. *See Strickland*, 466 U.S. at 687. As noted by the State, Counsel Lawson's statements were never heard by the jury. Moreover, Counsel Lawson's comments were not the basis of his withdrawal from the case. Counsel Lawson explained that Petitioner's complete refusal to discuss the case with him and the BPR complaint Petitioner filed against him "forced" him to withdraw.

Regarding the claim that Counsel Scott and Counsel Smith rendered ineffective assistance in their withdrawal from representation and in not helping Petitioner obtain successor counsel, the post-conviction court found:

When [P]etitioner and counsel appeared in court for the hearing on the motions to withdraw, "[Petitioner] informed the court that he had 'mailed out' lawsuits against both lead counsel and co-counsel to the United States District Court in Greeneville . . . . And since this is filed I really don't think there's much controversy. I don't think they can continue—continue under any circumstances." Petitioner then proceeded to call himself as a witness

- 74 -

on issues of ineffective assistance of counsel to support removal of counsel. During this presentation of evidence, [Counsel] Scott interjected to ensure that anything [P]etitioner testified to would only be for use in the hearing and not for trial, to which the trial court agreed. As [P]etitioner proceeded pro se, the trial court asked [P]etitioner if he would like for counsel to present the motion on his behalf and he declined, as he thought it would be a conflict to present evidence against themselves. Petitioner called [Counsel] Scott as a witness, but [Counsel] Scott at one point advised he thought counsel should have an opportunity to speak with [P]etitioner in order to ensure he did not do anything detrimental in asking counsel questions about privileged information. The parties took a break and upon returning, [P]etitioner withdrew his motions to remove counsel, and [Counsels] Scott and Smith proceeded on their motions to withdraw. At that point, the trial court stated the hearing would switch gears to move away from ineffective assistance to go toward withdrawal, which in turn meant considering the issue of possible waiver and/or forfeiture of counsel. When the trial court asked counsel to confirm certain matters related to mitigation specialists, counsel indicted they could not because the information was privileged and "we believe that it could hurt [Petitioner] by being part of the court's decision in whether or not he should have counsel appointed at some point in the future."

Petitioner did not testify here.

This [c]ourt has carefully considered the record as a whole and does not find [P]etitioner has carried his burden of proof as to either prong of ineffective assistance on this claim. [Counsels] Scott and Smith attempted to continue to represent [P]etitioner's interest, but without addressing claims of ineffective assistance of counsel lodged against them.

(citations omitted).

As noted by the State, Petitioner did not testify at the post-conviction hearing, and he did not question Counsel Scott or Counsel Smith about what steps, if any, they took to help Petitioner secure successor counsel; there is simply a lack of proof as to that aspect of his claim. Moreover, the record suggests it was Petitioner who limited Counsel Scott's and Counsel Smith's involvement in the dismissal, withdrawal, and forfeiture hearing and that, at the hearing, Counsel Scott and Counsel Smith kept Petitioner's interests in mind and attempted to protect his rights. Thus, we agree with the post-conviction court's determination that Petitioner did not carry his burden of proof on either prong of the *Strickland* analysis as to this allegation. He is not entitled to relief based upon this claim.

- 75 -

## B. Deprivation of the Right to Counsel

Petitioner contends that he was deprived of the right to counsel when he was forced to proceed pro se at his trial. Petitioner asserts that his behavior prior to trial "was nothing more than an effort to raise legitimate concerns about the quality of his representation." He notes that he was "never threatening, nor disruptive, and [he] even withdrew one complaint after meeting with his lawyers and being assured they would do the work they had promised to do." He insists that the facts of his case are far different from the facts in *Carruthers* and do not justify a finding that he waived or forfeited his right to counsel.

### *1. Stand-alone claim*

In denying relief, the post-conviction court found that this claim was previously determined on interlocutory appeal and on direct appeal. Tenn. Code Ann. § 40-30-106(h). On direct appeal, the Tennessee Supreme Court denied relief, quoting with approval this court's prior ruling on the issue:

> The State asserts that [Petitioner's] claims are barred by the law of the case doctrine. "[U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998). This doctrine "applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication," but the doctrine does not apply to dicta. *Id.* (citation omitted). The doctrine "is not a constitutional mandate nor a limitation on the power of a court" but "is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." *Id.* (citations omitted). Application of the doctrine promotes finality, efficiency, consistent results, and obedience to appellate decisions. *Id.*

> There are three "limited circumstances" that may justify a departure from the law of the case doctrine and subsequent reconsideration of an issue decided in a previous appeal:

>> (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3)

the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id*.

[Petitioner] contends that the trial court erred in requiring him to proceed pro se at trial and that this court's opinion upholding the trial court's order was "clearly erroneous." In affirming the trial court's order, this court reasoned:

> The trial court found that the spate of conflicts with appointed counsel was [Petitioner's] fault. It warned [Petitioner] on multiple occasions that his persistence in engendering conflicts that led to changes in counsel would result in his representing himself in the case. When the trial court ordered the first change of counsel, it engaged [Petitioner] in an extensive voir dire of his understanding of the imminence, difficulty, and risks of self-representation. Despite the trial court's warnings and explanations of the law, [Petitioner] persisted in intentional conduct that prompted the disqualification of counsel. In these circumstances, the trial court was justified in holding that [Petitioner] had implicitly waived his right to counsel.

> Furthermore, the record supports a finding of forfeiture. The trial court found that [Petitioner] used the tactic of suing his lawyers or filing complaints against them with the [BPR] as a means of coercing the court into discharging counsel and that the pattern was for the tactic to be employed as trial dates approached. The trial court gave [Petitioner] ample opportunity to show via argument, documents, and testimony that he was justified in complaining about counsel's performance. Nevertheless, [Petitioner] neither articulated nor established any basis for complaint against any of his attorneys. Additionally, the record shows that [Petitioner] refused to communicate with counsel and to cooperate with mental health evaluators. His conduct was egregiously manipulative and abusive of the judicial process; it warrants a finding that he forfeited his right to counsel.

*Willis*, 301 S.W.3d at 652. [Petitioner] has failed to establish that this court's holding was "clearly erroneous."

Moreover, after the case was remanded, [Petitioner] failed to allege evidence or circumstances that were substantially different from the circumstances that existed during the initial proceedings. On appeal, [Petitioner] failed to specify what change in circumstances warrant reconsideration of this court's initial holding. In his motions for appointment of counsel filed after remand, [Petitioner] sought to reargue the alleged deficiencies of prior counsel, raised issues of ineffective assistance of appellate counsel, and relied upon an "interest of justice-oversight" argument for which he offered no supporting authority. None of these claims constitute changed circumstances that qualify as an exception to the law of the case doctrine.

Finally, [Petitioner] has not established that this court's prior decision is contrary to a change in controlling law. Rather, [Petitioner] relies upon the Tennessee Supreme Court's decision in . . . *Carruthers*, . . . the same case upon which this court relied in affirming the trial court's decision in [Petitioner's] initial appeal. *See Willis*, 301 S.W.3d at 650-51. Accordingly, [Petitioner's] claims are barred by the law of the case doctrine.

*Willis*, 496 S.W.3d. at 743-44 (Appendix) (quoting the opinion of the Tennessee Court of Criminal Appeals). Thus, the post-conviction court properly determined that Petitioner's stand-alone claim regarding the trial court's ruling that he forfeited and/or waived his right to counsel was previously determined. Tenn. Code Ann. § 40-30-106(h). He is not entitled to relief.

### *2. Ineffective assistance of interlocutory appeal counsel*

Petitioner contends that the deprivation of his right to counsel ultimately occurred due to the ineffective assistance of counsel on interlocutory appeal. The State responds that appellate counsel performed competently.

We apply the same *Strickland* test used to assess the effectiveness of trial counsel to assess the effectiveness of appellate counsel. *Carpenter*, 126 S.W.3d at 886. We note that "[a]ppellate counsel [is] not constitutionally required to raise every conceivable issue on appeal." *Id*. at 887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999)). Generally, appellate counsel has the discretion to determine which issues to raise on appeal and which issues to leave out. *Id*. Thus, courts should give considerable deference to appellate counsel's professional judgment with regard to which issues will best serve the petitioner

on appeal. *Id*. This deference is only afforded appellate counsel, however, "if such choices are within the range of competence required of attorneys in criminal cases." *Id*.

In reviewing a claim of ineffective assistance of counsel based on the failure of appellate counsel to raise a specific issue on appeal, this court must determine the merits of the issue. *Id*. "If an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id*. Likewise, if the omitted issue has no merit, then the petitioner suffers no prejudice from appellate counsel's decision not to raise it. *Id*. If the issue omitted is without merit, the petitioner cannot succeed in his ineffective assistance claim. *Id*. The petitioner bears the burden of establishing that the omitted issue has merit. *Id*. at 888.

In addressing Petitioner's claim that counsel on interlocutory appeal rendered ineffective assistance, the post-conviction court stated:

> According to the records in [P]etitioner's case, he sent [Counsel] Gulley a copy of his pro se application for interlocutory appeal in July 2008 which included all his claims related to prior counsel and why he had requested that counsel be replaced. Petitioner complains that interlocutory appellate counsel never met with nor spoke with him concerning his appeal prior the ruling by the Tennessee Court of Criminal Appeals. It is undisputed that counsel did not speak with [P]etitioner in person or by phone; however, [Counsel] Gulley's billing records indicate he received letters from [P]etitioner [seven] times prior to any decision from the [appellate court], and counsel wrote [six] letters to [P]etitioner in this same time frame.

> Petitioner argues counsel did not raise on appeal any of the legitimate justifications for the changes in counsel, and as a result, the [appellate court] was presented with an inadequate record. Petitioner claims the [appellate] court was unaware of his complaints about his last set of lawyers and how they had failed to present a necessary and relevant witness on the suppression issue. Petitioner argues he sought to have [Counsel Gulley] present to the [appellate court] that his complaints about counsel were not dilatory nor manipulative, but rather based on real, actual concerns that he was not receiving effective assistance of counsel. He claims counsel advised the issue of ineffective assistance of counsel was better litigated in post-conviction proceedings. He argues because of this ineffective assistance of counsel, the [appellate court] never had a full understanding of the issue at hand, or the reasons why the trial court's ruling was in error.

Although [P]etitioner claims counsel was deficient on interlocutory appeal, he has failed to carry his burden of proof to establish the prejudice prong of the issue. While counsel's wording of the issue may have varied from [P]etitioner's, the issues were addressed by the appellate court on interlocutory appeal. Even if this [c]ourt assumed arguendo that interlocutory counsel was deficient in how he raised [P]etitioner's issues, the issues [P]etitioner sought to raise were in fact raised with the appellate courts on direct appeal in the manner in which [P]etitioner wanted. In the direct appeal brief, counsel raised the claim that he did not forfeit or waive his right to counsel and that [P]etitioner's actions were responses to legitimate issues with counsel and not manipulative. The appellate courts addressed the merits of the claims which were not successful. [*See Willis*, 496 S.W.3d at 738-44.] Accordingly, [P]etitioner has failed to carry his burden of proof on this issue and is not entitled to relief.

The record does not preponderate against the post-conviction court's factual findings, and we agree Petitioner has not established that he is entitled to relief under *Strickland*.

Petitioner asserts that Counsel Gulley failed to bring forward the merits of Petitioner's complaints against prior counsel and failed to ensure "that the record on appeal accurately reflected the reality of the reason for the changes in counsel[.]" As noted by the post-conviction court, Petitioner asserted on direct appeal that he did not forfeit or waive his right to counsel and that his actions were responses to legitimate issues with counsel and not manipulative, and he requested that this court and the Tennessee Supreme Court reconsider the previously decided issue. The appellate courts denied relief, concluding that Petitioner failed to offer any evidence that was "substantially different from the evidence in the initial proceeding" and, therefore, "reconsideration of [the] issue decided in a previous appeal" was not justified. *Willis*, 496 S.W.3d at 743-44. Thus, Petitioner has not carried his burden of showing that the results of the proceeding would have been different had Counsel Gulley argued on interlocutory appeal that Petitioner had legitimate issues or complaints against previous counsel. *See Strickland*, 466 U.S. at 694.

Petitioner claims that Counsel Gulley rendered ineffective assistance by failing to talk to Petitioner or prior counsel before filing the appellate brief. The record reflects that Counsel Gulley did not meet with Petitioner in person but that he communicated with Petitioner via multiple letters. Petitioner did not testify at the post-conviction hearing. Petitioner does not explain what he and prior counsel would have told Counsel Gulley or how that would have changed the outcome of the interlocutory appeal. *See Strickland*, 466 U.S. at 687.

- 80 -

Petitioner also contends that Counsel Gulley rendered ineffective assistance when he failed to ask the appellate court to remand the case for a hearing on the issue of waiver of counsel. However, Counsel Gulley testified at the post-conviction hearing that he viewed the record as sufficient for appellate review of the trial court's forfeiture order. He said that he did not believe the record needed to be supplemented and that the transcripts were extensive, containing statements from counsel and Petitioner. Moreover, Petitioner has not identified a procedural mechanism that would allow an appellate court reviewing a trial court order to remand the matter for the development of new proof that was not considered by the trial court when it issued the challenged order. Petitioner has not shown deficient performance or resulting prejudice based upon this allegation.

Additionally, Petitioner argues that Counsel Gulley rendered ineffective assistance by failing to raise the issue of ineffective assistance of pretrial counsel on interlocutory appeal. The record reflects that Counsel Gulley advised Petitioner that issues of ineffective assistance of counsel were generally more appropriate for post-conviction proceedings. Petitioner has not shown that Counsel Gulley's performance was deficient in this regard. This court has previously explained that ineffective assistance of counsel "is a single ground for relief[,] and a petitioner may not relitigate the issue by presenting new and different factual allegations in a subsequent proceeding." *Thompson v. State*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997); *see also Cone v. State*, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995). This court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails[,]" *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999), commenting that "raising the issue of ineffective assistance on direct appeal is a 'practice fraught with peril.'" *Thompson*, 958 S.W.2d at 161 (quoting *State v. Sluder*, No. 1236, 1990 WL 26552, at *7, (Tenn. Crim. App. Mar. 14, 1990), *perm. app. denied* (Tenn. July 16, 1990)).

In any event, because we have already concluded that Petitioner's claims of ineffective assistance of pretrial counsel are without merit, Petitioner has not established prejudice under *Strickland*. *See Strickland*, 466 U.S. at 687. He is not entitled to relief.

### C. Exclusion of Petitioner from Pretrial Hearing

Petitioner asserts that he was intentionally excluded from pretrial evidentiary hearings relating to the credibility of a key State witness. He notes that, after his indictment but before arraignment, the State became aware of a video interview Wilda Willis gave to a local television news station regarding "aspects of her knowledge of the case"; that the State sought to obtain the raw footage of the interview through a Petition to Divest filed with the trial court on December 30, 2002; that the State failed to provide service of the petition on Petitioner or any counsel for Petitioner; and that the Petitioner received no

notice of an evidentiary hearing on the petition. Petitioner argues that his exclusion violated Tennessee Rules of Criminal Procedure 43 and 49, along with constitutional due process rights, his right to be present at critical stages of proceedings, and his right to confrontation.

The State argues that Petitioner waived the stand-alone claims relating to the exclusion of Petitioner from the hearing on the Petition to Divest by failing to raise the claims on direct appeal, and we agree. *See Willis*, 496 S.W.3d 653; Tenn. Code Ann. § 40-30-106(g).

Both here and before the post-conviction court, Petitioner acknowledged that he did not present the claims for consideration pretrial, in his motion for new trial, or on direct appeal but made a perfunctory allegation that his waiver of the claims "arose from the ineffective assistance of counsel," who failed to voice objections or to raise the claims on appeal. Consequently, the post-conviction court addressed Petitioner's claim of ineffective assistance of counsel (pretrial, in the motion for new trial, and on appeal) and found that Petitioner failed to carry his burden of proof.

In addressing Petitioner's ineffective assistance of counsel claim, the post-conviction court made the following factual findings:

> . . . [T]he evidence establishes [P]etitioner was not represented by counsel at the time of the pleadings and hearing referred to below; although [Counsel] Bowman testified in these proceedings he was still [P]etitioner's attorney through the end of February of 2003, the records indicate both [P]etitioner and law enforcement understood [Counsel] Bowman's representation ended at the filing of the indictment, which was October 23, 2002. In fact, [Counsel] Bowman actually questioned [P]etitioner about this during his testimony in the 2004 Suppression Hearing. In fact, [P]etitioner and Todd Hull both testified at the suppression hearing that when served with the indictment the first thing [P]etitioner asked was who would be his attorney.

> In addition, it is undisputed [P]etitioner was transferred to New York on October 29, 2002, prior to any arraignment and did not return to Washington County until July of 2003.

(footnote and citation to record omitted). The post-conviction court then listed the documentary evidence located in the trial court records relating to the subpoenas and Petition to Divest filed by the State, as follows:

On October 31, 2002, and November 1, 2002, subpoenas were issued by the State to WJHL-TV and Christine Riser of WJHL, respectively, and returned;

On November 6, 2002, counsel for WJHL filed an Objection to the Subpoenas and a Motion to Quash the Subpoenas, with accompanying exhibits;

On December 30, 2002, the State filed a Petition to Divest WJHL of the entire recordings of interviews WJHL did with Wilda Willis;

On February 5, 2003, an Opposition to the Petition to Divest and Renewed Motion to Quash was filed by counsel for WJHL;

On February 11, 2003, the trial court held a hearing on the various pleadings filed by WJHL and the State; and

On February 28, 2003, the trial court entered an order denying the motion to divest and quashing the subpoenas.

The post-conviction court noted that the "records were among the first 50 pages of documents in the trial court file, the interlocutory appeal file, and the direct appeal file." The post-conviction court continued:

[Counsels] Bowman, Simmons, and Morris stated they did not recall having seen the above referenced documents, despite those documents covering approximately twenty pages of the record. Admittedly, a great deal of time has passed since [P]etitioner's various attorneys represented him. [Counsel] Morris stated she assumed it may have been part of the record her co-counsel, who is now deceased, reviewed, as they had divided the records up when they reviewed them twice. [Counsel] Bowman's and [Counsel] Simmons's co-counsels were not called as witnesses here, and [Counsels] Scott, Smith, and Lawson were not asked about the petition to divest when they testified.

Petitioner's pro se application for interlocutory appeal included the documents, and the subpoenas were also included as separate exhibits. Although it is alleged [P]etitioner did not receive official notice of the hearing, transcribed conversations he had with Wilda Willis from February 4-19, 2003, indicate [P]etitioner was aware of the hearing; in the conversations, there was one reference to the hearing with WJHL made the week before the hearing, and a second reference was made again after the hearing.

- 83 -

In addition, after cross-examining his ex-wife, [P]etitioner made the following statements at a bench conference on the record:

> [Wilda Willis] has given contradictory recorded video . . . interviews to WJHL, which the [S]tate themselves sought to quash because they were contradictory to where she told one time she did believe it, and one time she didn't believe it. So, I'd ask the court to . . . let it lay the way it is.
>
> . . . .
>
> I'd also bring to the court's attention that during December, of 2002, [Wilda Willis] was talking to WJHL and set up times for [Petitioner] to call them, Your Honor. So—with that in mind . . . I've got to ask the court to take into consideration that she did not—she had given various versions in which she said, yes, she believed it, yes, she didn't believe it. And that's—will come into play in some testimony that's going to be given when—in the defense.

Clearly, [P]etitioner was aware of the interviews and the State's attempts to get copies of them from WJHL. He indicates he was aware she had given different versions of what she believed, and he had a strategy related to how he was planning to use this in the defense.

(footnotes and citations to record omitted).

The post-conviction court found:

Petitioner did not testify . . . and all counsel who may have had information concerning this issue did not testify . . . . When acting as his own counsel, [P]etitioner indicate[d] he was aware of the contradictory statements [but] did not raise any issue concerning discovery or notice. Under these circumstances, this [c]ourt finds [P]etitioner has not carried his burden of proof. Petitioner had the issue available to him while self-representing but did not raise the issue at any point. In addition, no counsel recalled [P]etitioner raising the issue with them.

Assuming arguendo, that counsel was deficient, this [c]ourt does not find any prejudice. Petitioner was aware of the interviews and the proceedings from his own comments during trial but did not raise the issue.

Petitioner clearly indicated a strategy related to the interviews. Wilda Willis . . . was also not called as a witness concerning this issue. Having carefully reviewed this issue, this [c]ourt does not find [P]etitioner has carried his burden of proof on the issue of prejudice and no relief is warranted.

The record does not preponderate against the post-conviction court's findings. *See Kendrick*, 454 S.W.3d at 457. Because Petitioner failed to prove that counsels' performance was deficient and that the deficiency prejudiced the defense, he is not entitled to relief. *Strickland*, 466 U.S. at 687.

## D. Deprivation of Fifth Amendment Right to Remain Silent

Next, Petitioner argues that the State intentionally deprived him of his Fifth Amendment rights by eliciting incriminating statements from him through "deception and a concerted effort to undermine [his] right to remain silent." Petitioner contends that he had previously invoked his right to remain silent, both personally and through his attorney, but that prosecutors and law enforcement "worked together to formulate a plan to obtain incriminating statements" from him in response to questioning by an undercover agent, Wilda Willis. He contends that such statements were inadmissible, absent a voluntary waiver.

Petitioner raised this claim previously on direct appeal. In its opinion, the Tennessee Supreme Court thoroughly addressed Petitioner's Fifth Amendment self-incrimination claim and his intertwined Fifth Amendment and Sixth Amendment right to counsel claims and determined that Petitioner was not entitled to relief. *See Willis*, 496 S.W.3d at 700-15. As such, we agree with the post-conviction court's determination that Petitioner's claim is previously determined and that, "[t]o the extent [P]etitioner attempts to make new allegations related to this same issue, [any] new allegations are waived." *See* Tenn. Code Ann. § 40-30-106(h)-(g).

## E. *Brady/Johnson* Claims

Petitioner contends that "multiple and pervasive *Brady/Johnson* issues prevented [him] from receiving the due process of law." Specifically, he contends that the State intentionally withheld information relating to the credibility of witnesses Tom Smith, Tom Remine, and Dr. Gretel Stephens; a "courtroom outburst" by Betty Willis; and Patty Leming's mental health.

The United States Supreme Court stated in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution." "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Evidence is also considered favorable under *Brady* if "it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation[.]" *Nunley v. State*, 552 S.W.3d 800, 818 (Tenn. 2018).

Four prerequisites must be satisfied to establish a *Brady* violation:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Even if the defendant does not specifically request evidence, favorable evidence is material, and its suppression is a constitutional violation, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id*. The defendant bears the burden of proving a constitutional violation by a preponderance of the evidence. *Id*.

The prosecution's duty to disclose extends to "favorable information" unknown to the accused; it is not limited to evidence that could be admitted at trial. *State v. Marshall*, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992). Additionally, the State is responsible to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Strickler v. Greene*, 527 U.S. 263, 307 n.12 (1999). But the prosecution "is not required to disclose information that the accused already possesses or is able to obtain." *Marshall*, 845 S.W.2d at 233. "When exculpatory evidence is equally available to the prosecution and the accused, the accused must bear the responsibility of his failure to seek its discovery." *Id*. There can be no *Brady* violation when evidence is available from another source "because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

"Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply,

- 86 -

unless the delay itself causes prejudice." *McKay v. State*, No. W2008-02274-CCA-R3-PD, 2010 WL 2384831, at *8 (Tenn. Crim. App. June 15, 2010) (quoting *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting)), *perm. app. denied* (Tenn. Jan. 13, 2011). "Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is too late for the defendant to make use of any benefits of the evidence." *State v. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at *8 (Tenn. Crim. App. June 19, 1998), *opinion vacated and reentered*, No. 01C01-9612-CR-00531, 1998 WL 485614 (Tenn. Crim. App. Aug. 18, 1998) (internal citation omitted), *perm. app. denied* (Tenn. Feb. 22, 1999). "If the defense fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify regarding the evidence, or fails to extensively cross-examine a witness regarding the evidence, the *Brady* violation may be cured." *State v. Galindo*, No. E2020-00556-CCA-R3-CD, 2021 WL 270021, at *9 (Tenn. Crim. App. Jan. 27, 2021), *perm. app. denied* (Tenn. May 12, 2021) (citing *Ewing*, 1998 WL 321932, at *9).

### *1. Information relating to Tom Smith*

Petitioner contends that the State should have disclosed information concerning Tom Smith's credibility. He alleges that Judge Robert Cupp had barred Mr. Smith from appearing in his courtroom based upon findings made by Federal Magistrate Judge Dennis Inman, relating to Mr. Smith's credibility. Petitioner asserts that the issues relating to Mr. Smith's credibility were known to the State prior to trial and that the prosecutor failed to communicate the nature of this issue to the defense in response to Petitioner's request for *Brady/Johnson* information. He contends that, had the State turned over this information, it could have led to "fruitful defense investigation" and "could have been useful in questioning the good faith or quality of the police investigation[.]"

In denying relief on this claim, the post-conviction court found that the claim was waived pursuant to Tennessee Code Annotated section 40-30-106(g) because Petitioner had the opportunity to address the issue on direct appeal but failed to do so. *See Odom v. State*, No. W2015-01742-CCA-R3-PD, 2017 WL 4764908, at *43 (Tenn. Crim. App. Oct. 20, 2017) (concluding, in death penalty post-conviction case, that Petitioner's claims of prosecutorial misconduct were waived because "Petitioner did not present these specific challenges on direct appeal even though he had the opportunity to do so"), *perm. app. denied*, (Tenn. Apr. 23, 2018).

Waiver notwithstanding, the post-conviction court found that Petitioner was aware of the information at the time of trial. The record reflects that, when the State called Mr. Smith as a witness during trial, Petitioner asked to approach the bench and told the trial court that he wanted to ask Mr. Smith about being barred from Judge Cupp's courtroom, and he referenced the magistrate judge's report and recommendation. The post-conviction

court noted that the trial court explained to Petitioner how Petitioner could introduce the evidence, but Petitioner chose not to do so. The post-conviction court found that Petitioner "was clearly aware of the issue as it related to [Mr.] Smith" and that the evidence was not in the exclusive control of the State. Accordingly, the court determined that the waived *Brady* claim was also without merit.

We agree with the post-conviction court that Petitioner waived this issue by failing to raise it on direct appeal. *See Willis*, 496 S.W.3d 653; Tenn. Code Ann. § 40-30-106(g). The record shows that Petitioner clearly knew of Mr. Smith's credibility issues at the time of trial. Petitioner did not testify at the post-conviction hearing, and he offers no explanation as to why he failed to raise the issue in his direct appeal. The issue is waived.

### 2. Information relating to Tom Remine

Petitioner asserts that the information regarding Mr. Remine's use of marijuana was known to the State prior to trial but that the State failed to disclose the information to the defense in response to the *Brady/Johnson* request. Petitioner alleges that he was not made aware of the circumstances of Mr. Remine's termination pretrial, that he learned of the information just before Mr. Remine testified, and that the information was not available to him by other means. He argues that because General Brooks failed to correct General Clark's statement to the court that Mr. Remine left the sheriff's department "of his own accord," the true nature of Mr. Remine's dismissal from the sheriff's department remained unknown to Petitioner until this post-conviction action. Petitioner asserts that, by failing to disclose the information, the State violated his right to due process.

In denying relief on this issue, the post-conviction court found that Petitioner waived the issue by failing to raise it on direct appeal. *See Willis*, 496 S.W.3d 653; Tenn. Code Ann. § 40-30-106(g). The post-conviction court further found that, even if the claim was not waived, Petitioner would not be entitled to relief on the merits. The post-conviction court noted that "General Brooks testified he could not say he could hear the district attorney's statements which were stated at a bench conference to avoid jurors hearing." The court continued:

> At the trial, the State moved to prohibit asking Mr. Remine concerning the reason for his departure from law enforcement related to drug use for which there had been no criminal charges. Exhibit 4 to these proceedings indicates Mr. Remine was terminated effective February 13, 2008, approximately [five] years and four months after the victims' deaths and [P]etitioner's arrest. Exhibit 9 was an article dated March 3, 2008, which referred to the prosecutor and his knowledge of Mr. Remine's termination. At trial, Mr. Remine testified concerning an issue of chain of custody for a

gun located in the grass between the residence of Betty Willis and a neighbor. Another officer testified to finding the gun and turning it over to Mr. Remine.

. . . .

Assuming arguendo that the State had a duty to disclose this information, the record does not support that it was material due to the length of time that had passed and the minimal testimony provided by [Mr. Remine] on the issue of chain of custody. Therefore, this Court finds [P]etitioner has not carried his burden of proof as to prejudice in that the issue raised could not have affected the verdict to the prejudice of [P]etitioner.

Upon review, we agree with the post-conviction court's determination that Petitioner waived this claim. As noted by the State, Petitioner was aware of Mr. Remine's drug use and employment history at trial. Before Mr. Remine testified, General Clark told the trial court about Mr. Remine's narcotics use and his termination/resignation from the sheriff's department. Despite being aware of this potential *Brady* issue, Petitioner failed to raise the issue on direct appeal when he could have. *See Willis*, 496 S.W.3d 653. Therefore, the claim is waived. Tenn. Code Ann. § 40-30-106(g).

Waiver notwithstanding, we note that Petitioner introduced a news article from 2009 discussing Mr. Remine's firing at the post-conviction hearing. As this information was readily available from another public source prior to Petitioner's trial, there was arguably "nothing for the [State] to disclose." *Coe,* 161 F.3d at 344. Even presuming that the State had a duty to disclose the information, we agree with the post-conviction court that the information was not material for the purposes of *Brady*. *See Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995). Mr. Remine was a chain-of-custody witness; he testified that a piece of evidence was transferred to him by another officer and that he logged it into evidence. Additionally, Mr. Remine's involvement in Petitioner's case occurred in 2002, but his marijuana usage and termination occurred in 2007-08. This information does not place "the whole case in such a different light as to undermine the confidence of the verdict." *Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998).

### 3. Information relating to Dr. Stephens

Petitioner contends that, prior to trial, and just over six months after completing the victims' autopsy reports, Dr. Stephens was officially reprimanded by the Tennessee Department of Health for unprofessional, dishonorable, or unethical conduct which was not consistent with the standards of practice. Petitioner claims that information regarding Dr. Stephens's discipline for improper storage and handling of samples fell under *Brady/Johnson*, "especially in light of the importance of sample integrity to the

determination of post-mortem interval" in this case. He asserts that, prior to presenting testimony from Dr. Stephens, the State failed to inquire into whether she had ever been disciplined for poor job performance and contends that the State has a duty to make such inquiries.

In its order denying relief, the post-conviction court found that Petitioner waived this issue by failing to raise the claim on direct appeal. *See Willis*, 496 S.W.3d 653. We agree with the post-conviction court's determination that the issue is waived. Tenn. Code Ann. § 40-30-106(g); *Odom*, 2017 WL 4764908, at *43. Even if the claim was not waived, the information concerning Dr. Stephens' reprimand was not in the exclusive control of the State—as evidenced by news articles introduced by Petitioner at the post-conviction hearing. *See Coe*, 161 F.3d at 344. Moreover, Petitioner has not shown that the information about Dr. Stephens' reprimand was material. As noted by the State, Petitioner has not alleged much less offered evidence that Dr. Stephens improperly stored materials in this case; rather, Petitioner developed evidence during his cross-examination of Dr. Stephens at trial that she properly stored the victims' tissue samples. Petitioner has not shown a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682. This issue is waived, and Petitioner is not entitled to relief.

### 4. Information relating to Betty Willis's "courtroom outburst"

Petitioner asserts that, at a suppression hearing in Betty Willis's criminal case wherein she was charged with accessory after the fact, she interrupted the proceedings to correct a witness about the nature of some fuel cans in the storage unit where the victims' bodies were found. Petitioner asserts that this "courtroom outburst" indicated that Betty Willis "had personal knowledge of the bodies" as they were found in her storage shed and that proof of this outburst could have been used at Petitioner's trial as evidence of guilt of a third party.

At the post-conviction hearing, Petitioner introduced a transcript of the hearing on Petitioner's Motion to Disqualify the District Attorney's Office, which was heard previously by the post-conviction court on April 27, 2021. During that hearing, General Finney was questioned about Betty Willis's outburst, and he agreed that her statement tended to show her involvement as an accessory after the fact. When asked whether he ever told Petitioner's counsel about Betty Willis's courtroom outburst, General Finney stated, "I'm not saying it didn't happen. I don't want you to think that. But I just don't have any memory of it." Petitioner presented no additional proof regarding this alleged *Brady* violation at the post-conviction hearing.

In denying relief, the post-conviction court found that Petitioner waived this issue by failing to raise it on direct appeal, and we agree. Petitioner did not testify at the post-conviction hearing, and he offers no explanation as to why he failed to raise the claim previously. Thus, the issue is waived. *See* Tenn. Code Ann. § 40-30-106(g).

In any event, the information about Betty Willis's courtroom outburst is not material under *Brady*. Although Betty Willis's open-court statement shows some knowledge about the contents of the storage unit where the victims' bodies were found, the State introduced a wealth of information at Petitioner's trial demonstrating that Betty Willis knew of the storage unit's contents. *See Willis*, 496 S.W.3d at 668-69, 675-76. Petitioner has not explained how the information about Betty Willis's courtroom outburst would have changed the presentation of his defense or how it would have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Petitioner is not entitled to relief.

### 5. Information relating to Patty Leming's mental health

Petitioner asserts that the State should have disclosed to the defense prior to trial that witness Patty Leming suffered from schizophrenia. Petitioner argues that Ms. Leming's mental state was particularly important because she was a fact witness who purported to see Petitioner with the victims close to the time of their disappearance.

Again, the post-conviction court found that Petitioner waived this issue by failing to raise it when he had the opportunity on direct appeal. *See Willis*, 496 S.W.3d 653. We agree with the post-conviction court's determination. We note that Ms. Leming testified she suffered from schizophrenia at the penalty phase of Petitioner's trial. As such, Petitioner was aware of this information prior to the filing of his direct appeal, and he offers no explanation as to why he failed to raise this claim previously. Thus, the issue is waived. Tenn. Code Ann. § 40-30-106(g).

### 6. Failure to correct misrepresentations regarding Wilda Willis

As to his final *Brady/Johnson* claim, Petitioner asserts that, at his first motion to suppress hearing, the State asserted that Wilda Willis had been acting on her own and not at the direction of the State when she had obtained statements from Petitioner. Petitioner claims that, at a subsequent motion to suppress hearing held in March 2005, he had in his possession a police report "regarding Wilda Willis being sent to get a statement from [Petitioner,]" which supported his claim that she was acting at the direction of the State. Petitioner contends that prosecutors at this hearing knew that he "was correct in his description of their own report, but did not correct the [trial court] . . . instead allowing [the court] to persist in [the] incorrect belief" that Wilda Willis acted on her own.

By his own admission, Petitioner was aware of the police report containing this information as of March 2005; however, Petitioner failed to raise this alleged *Brady* violation when he had the opportunity to raise it in his direct appeal. Petitioner did not testify at the post-conviction hearing, and he offers no explanation as to why he failed to raise this claim previously. Thus, just as the post-conviction court determined, we conclude that Petitioner waived this issue by failing to raise it on direct appeal. Tenn. Code Ann. § 40-30-106(g).

## F. Denial of Adequate Time and Resources to Prepare

Petitioner argues that he was denied due process by not having the "opportunity to participate meaningfully" in the proceedings against him. Specifically, Petitioner asserts that that the trial court deprived him of adequate time and resources to prepare for trial by denying Petitioner "privileges of special phone access, equipment, and an investigator" during the pendency of his interlocutory appeal. He argues that the trial court's suspension of his use of an investigator during the pendency of the interlocutory appeal "meant that [his] trial preparation effectively ceased until his appeal was denied . . . less than three months before trial." Petitioner notes that he sought additional time to prepare and for "meaningful access to a law library" but that the trial court denied both requests. He contends that the trial court's denial of sufficient time and resources was structural error because the denial affected the "entire conduct of [Petitioner's] trial[.]"

As noted by the State and found by the post-conviction court, Petitioner presented this claim on direct appeal, and the Tennessee Supreme Court affirmed this court's determination that the trial court acted properly in denying several continuance requests, staying proceedings during the appeal, and suspending Petitioner's investigatory privileges during this same time frame. *Willis*, 496 S.W.3d at 745-48 (Appendix). The Court agreed with this court's conclusions that nothing in the record established Petitioner did not have a fair chance to present his case in his own way and that Petitioner was not denied his right to access to the courts. *Id*.

This claim has been previously determined, and therefore, it cannot form the basis for post-conviction relief. Tenn. Code Ann. § 40-30-106(h); *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

## G. Denial of Expert Services by the Trial Court[7]

Petitioner asserts that, after the denial of his interlocutory appeal, he sought funding for the expert services of Dr. Richard Ofshe, an expert in false confessions; Wayne N. Hill, Sr., an expert in crime scene forensic analysis; and Dr. Neal Haskell, an expert in forensic entomology. At a hearing on Petitioner's motion for funding, the trial court denied the motion as to Dr. Ofshe and Mr. Hill, finding that Petitioner had failed to show "a particular rise in need pursuant to statute, nor ha[ve] the affidavits and the motions [of Dr. Ofshe and Mr. Hill] . . . set forth in precise statements that their evidence . . . will be admissible." Petitioner challenges the trial court's ruling, asserting that no statute, rule, or case law requires that a defendant's proposed expert be able to provide admissible testimony.

As noted by the State, Petitioner raised a challenge to the trial court's denial of his motion for funding on direct appeal, and the Tennessee Supreme Court held the denial of the experts Petitioner desired was proper because Petitioner failed to establish the requisite particularized need for such funding, concluding that "neither of the requested experts would have testified relating to a matter that was likely to be a significant issue in the defense at trial" and that "[n]either expert was necessary to protect [Petitioner's] right to a fair trial." *See Willis*, 496 S.W.3d at 723-25.

This claim has been previously determined, and it cannot form the basis for post-conviction relief. Tenn. Code Ann. § 40-30-106(h); *Cauthern*, 145 S.W.3d at 599.

## H. Cumulative Error

Petitioner insists that cumulative error warrants reversal in this case. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. In other words, only where there are multiple deficiencies does this court determine whether they were cumulatively prejudicial. In this case, because we have not found any errors, cumulative error review is unwarranted. Petitioner is not entitled to relief.

---

[7] Petitioner also asserts in this section of his brief that pretrial counsel was ineffective in not seeking funding for expert services; we have addressed this issue in the section of our analysis regarding ineffective assistance of counsel.

## I. Constitutionality of the Death Penalty

Finally, Petitioner claims that the death penalty is unconstitutional in eleven different respects, citing only the United States Constitution, Amendments XIV, VI, VIII, and Article I, §§ 8, 9, 13, 16, 32 of the Tennessee Constitution in this section of his brief. The State responds that Petitioner's claims are either waived or previously determined and that they are "all without merit."

On direct appeal, Petitioner challenged the practice of "death qualifying" the jury on Sixth Amendment grounds, claimed that the aggravator and mitigation statutes permitted the State to introduce unreliable evidence in violation of multiple constitutional rights, argued that the statute mandating victim impact testimony be considered violated separation of powers, alleged that the death penalty was discriminatorily applied on the basis of race, gender, geographic region, and economic/political status, posited that the prosecutor's discretion over seeking the death penalty resulted in "wanton and freakish" imposition of the punishment, suggested execution by electrocution or lethal injection constituted cruel and unusual punishment, argued that the prohibition on informing the jury on the consequence of failing to reach a unanimous verdict violated multiple constitutional strictures, asserted that the death penalty statutes failed to require the jury to make factual findings and an ultimate determination that death was appropriate, and opined that Tennessee's statutory scheme did not properly narrow the class of death penalty eligible defendants. This court rejected each of these claims, *Willis*, 496 S.W. at 756-61 (Appendix), and the Tennessee Supreme Court has determined that Petitioner's death sentences were not disproportionate or arbitrary. *Id.* at 730-37. In the instant appeal, Petitioner raises identical claims regarding the lack of narrowing of death eligible defendants, the legality of victim impact testimony, the process of death qualifying jurors, the prohibition on informing the jury on the nature of capital sentencing, proportionality, and arbitrariness. Because these claims were raised on direct appeal, they are previously determined and may not be relitigated on post-conviction. Tenn. Code Ann. § 40-30-106(h).

Petitioner additionally raises what appear to be new constitutional challenges— suggesting that the funding allocated to capital defendants is constitutionally insufficient, that the number of aggravators is excessive, that the aggravators are unconstitutionally vague, and that Tennessee's death penalty system unconstitutionally prohibits the defense from "addressing jurors' popular misconceptions" about capital sentencing. These claims were not raised on direct appeal when they could have been, *see Willis*, 496 S.W.3d 653, and they are, therefore, waived. Tenn. Code Ann. § 40-30-106(g). Petitioner is not entitled to relief.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_s/ **ROBERT L. HOLLOWAY, JR.**_

ROBERT L. HOLLOWAY, JR., JUDGE